**In re PSYCHIATRIC HOSPITALS OF HERNANDO, INC., Debtor.**

**Bankruptcy No. 95–02533–8P1.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Feb. 27, 1997.

Domenic L. Massari, III, Tampa, FL, for Debtor.

Sara Kistler, Tampa, FL, Assistant United States Trustee.

Scott L. Beana, Stroock & Stroock & Lavan, Miami, FL, for J.I.T., Inc.

Robert A. Soriano, Tampa, FL, Anne Marie Kelley, Peter C. Hughes, Dilworth Paxson, Philadelphia, PA, for Psychiatric Hospitals of Pennsylvania, Inc.

Mark J. Wolfson, Foley & Lardner, Tampa, FL, for First Union National Bank of Florida, N.A.

Steven Berman, of Salem Saxon, Tampa, FL, Robert M. Cohen, Key Biscayne, FL, for Hernando County Tax Collector.

## ORDER ON MOTION TO EQUITABLY SUBORDINATE THE CLAIM OF J.I.T., INC.

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a yet to be confirmed Chapter 11 case and the matter under consideration is a motion filed by Psychiatric Hospitals of Pennsylvania, Inc. (Eugenia). The Motion is filed in the Chapter 11 case of Psychiatric Hospitals of Hernando, Inc., d/b/a Greenbrier Hospital (Debtor). Eugenia, in its Motion, contends that the claim filed in this Chapter 11 case by J.I.T., Inc. (J.I.T.) in the amount of $1 million and secured by all assets of the Debtor should be subordinated in part. Eugenia contends that only $250,000 of the total claim should be allowed as a secured claim and the balance should be allowed but subordinated and paid only if all the allowed general unsecured claims are paid in full.

Ordinarily, the procedure to subordinate a claim is an adversary proceeding by virtue of Federal Rule of Bankruptcy Procedure 7001(8). However, inasmuch as the subordination under consideration is sought as part of the Plan of Reorganization filed by Eugenia, it is proper to present the issue by way of motion. For this reason a resolution of the issues raised by this Motion will be binding only in the context of the confirmation process of the Eugenia Plan.

The historical background relating to the Debtor and the origin and the basis of J.I.T.'s claim is helpful in order to properly focus on the issues raised in the Motion. The historical background presented will focus not only on the Debtor, but also on the Debtor's affiliates, and the particular role and involvement of Robert M. Cohen (Cohen) with the Debtor and its affiliates.

## HISTORICAL BACKGROUND OF CORPORATE ENTITIES

In 1977, an entity known as E.H.I., Inc. (E.H.I.) was formed by Cohen and others for the purpose of acquiring and operating a psychiatric hospital known as Eugenia Hospital located in Pennsylvania. In the early 1980's, E.H.I. changed its name to Psychiatric Hospital of America Inc. (PHA) and expanded its operations by acquiring additional psychiatric hospitals: Eugenia Hospital and Huntington Hospital, both located in Pennsylvania; and Horizon Hospital, Harbor View Hospital, and Greenbrier Hospital located in Florida. During 1984 through 1985, Cohen held the majority of shares of stock in PHA.

In 1985, PHA formed an employee stock option plan for Psychiatric Hospitals of America (ESOP) for the benefit of employees of PHA and its wholly-owned subsidiaries. The ESOP was to be funded in part through financing and in part by the acquisition of stock held by Cohen. Cohen, on behalf of the majority shareholders, entered into a Sales Agreement with the ESOP dated January 31, 1985. Pursuant to the Sales Agreement, Cohen agreed to sell his majority interest in PHA to the ESOP for the purchase price to be determined later by an appraiser.. The ESOP was to be administered by a group headed by Alan Feldman (Feldman Group). Cohen's stock in PHA was placed in escrow pending the appraisal of the stock and pending the Feldman Group raising sufficient funds to pay for the stock. An attorney from Harrisburg, Pennsylvania, Paul Killion (Killion), was acting as the escrow agent.

Although the value of the Cohen stock was subsequently determined by litigation to be $13.8 million, the Feldman Group was not successful in raising the funds necessary to purchase the stock, and the deal did not close. Notwithstanding, the stock remained in escrow with Killion until the deal was ultimately closed in or about December 1995 and after the commencement of this Chapter 11 case.

It is without dispute that the employees of PHA or its subsidiaries, including the employees of the Debtor, never received any stock or monetary distribution from the ESOP or any notice that any such distribution was being held for the benefit of the employees. It is further without dispute that the ESOP failed to file annual reports with the U.S. Department of Labor for the years of 1993, 1994, 1995. Killion, who also became a trustee of the ESOP, produced a bank statement for the ESOP which indicated that ESOP had only $2,321.39 on deposit on October 6, 1996. (Eugenia Exh. # 24).

Although, as noted earlier, the ESOP was ultimately implemented in December 1995, it is without dispute that the ESOP has yet to pay Cohen for the stock and the fact of the matter is, under the Agreement, the stock will not be paid for until the Plan submitted by Eugenia is confirmed.

Cohen contends that since 1985 he was merely an equitable owner of the PHA stock by reason of an alleged sale of the PHA stock to the ESOP. Nonetheless, there is no question that the transaction was never consummated even after the value of stock was determined, the stock was never paid for, and throughout the relevant years Cohen had been and still was the majority stockholder of PHA, the ultimate parent of this Debtor. The fact that the stock remained in escrow does not require a different conclusion.

## FACTS SURROUNDING THE DEBTOR'S INVOLVEMENT WITH PHA AND COHEN

The Motion under consideration seeks to subordinate, in part, a claim filed by J.I.T. in the amount of $1 million. The Motion seeks to subordinate all but $250,000 of J.I.T.'s claim. The facts preceding the acquisition by J.I.T. of the secured claim under consideration can be summarized as follows. The record reveals that in June 1988, Health Care Real Estate Investment Trust Company of Toledo, Ohio (REIT) loaned $13.7 million to PHA. The proceeds of this loan were distributed by PHA as follows: $10 million to Horizon Hospital and $3.7 million to Harbor View Hospital. The proceeds were secured by the properties of these entities. Under the Loan Agreement, any change in the legal or equitable ownership of PHA was an event of default of the loan.

During the time that the Loan Agreement was in effect, it appears that a dispute developed between Cohen and the minority stockholders of PHA. The dispute culminated in litigation in the Eastern District of Pennsylvania. The dispute was ultimately settled, pursuant to which settlement, ownership of the PHA stock was rearranged and changed. The settlement was formalized with the execution of a Loan Modification Agreement Regarding Corporate Separation (Loan Modification) dated November 24, 1992 (Eugenia Exh. # 31).

Because the settlement between Cohen and the minority stockholders effectuated a change in ownership of PHA, REIT threatened to initiate an action to foreclose its mortgage liens on Horizon Hospital and Harbour View Hospital. It should be noted that at this time Horizon Hospital became the corporate parent of the Debtor. In order to avoid the foreclosure, PHA entered into the Loan Modification (Eugenia Exh. # 31). Pursuant to the Loan Modification, REIT received the following additional collateral for its mortgage loan. First, a guarantee of $2 million by Eugenia; second, a mortgage on all real property holdings of Eugenia securing $1 million of the $2 million guarantee of Eugenia; third, a $1 million mortgage on the real estate holdings of this Debtor; and fourth, the personal guarantee of Cohen up to $500,000.

In mid–1994, the REIT obligation fell into default again. REIT instituted a suit against Cohen on his guarantee and in September 1995 obtained a judgment against Cohen in the full amount of the personal guarantee (Eugenia Exh. # 11). In addition, REIT was about to foreclose its mortgage lien on the Hospital facilities including foreclosure on its lien on the assets of this Debtor. In order to forestall the foreclosure action threatened by REIT, PHA and its affiliates filed a Petition for Relief under Chapter 11 in March 1995.

## FACTS SURROUNDING THE ACQUISITION OF THE REIT CLAIM

In the fall of 1995, Killion and counsel of record of this Debtor, Domenic Massari (Massari), commenced to deal with the REIT problem. It is important to note at this point that Massari participated in these negotiations ostensibly as counsel of record for the Debtor but clearly on behalf of Cohen and Killion who represented ESOP. It is without dispute that Massari negotiated the purchase of the REIT claim and the Cohen judgment even though he has not represented either J.I.T. or Cohen. Further, the REIT Settlement Agreement (Eugenia Exh. 11) recited that the parties to the agreement included Killion, as Trustee of ESOP and Killion as Escrow Agent under the original Stock Sale Agreement dated January 31, 1985. The Debtor did not execute the REIT Settlement Agreement and the Debtor never received Bankruptcy Court approval of the REIT Settlement Agreement.

In the sales transaction memorialized by Eugenia Exhibits 11–15 J.I.T. paid the sum of $750,000 to REIT. In return, J.I.T. received an assignment of the mortgage held by REIT encumbering all assets of the Debtor and an assignment of the $500,000 judgment which REIT obtained against Cohen on his guarantee. The face amount of the REIT claim was $1 million as well as all the REIT claims against the Debtor and the junior participation interest in the amount of $1 million in a REIT claim against Horizon. (Eugenia Exh. 11, pg. 1–2). It is without dispute that the Debtor did not assume the obligation owed to REIT, that the Debtor has no personal liability to REIT, and the claim J.I.T. purchased from REIT is only an *in rem* claim, representing a lien encumbrance on the hospital facility owned by the Debtor. This obligation, as noted earlier, has its origin in a post-default workout of the loan negotiated with REIT by PHA, the Debtor's ultimate parent.

The transaction was fully consummated on December 15, 1995 by Massari's delivery of a check in the amount of $750,000, drawn on his trust account to REIT, even though Massari disclaims that he represented Cohen or J.I.T. in this transaction.

## COHEN'S INVOLVEMENT IN THE TRANSACTION DESCRIBED

In addition to the facts already noted that Cohen was the majority stockholder of E.H.I.

later renamed PHA, Cohen clearly remained the primary moving force of the affairs of all the Debtors notwithstanding his claim that he divested himself of any interest in PHA at the time the original Stock Sale Agreement was entered into in 1985. As noted earlier, this transaction was never consummated. Clearly Cohen remained the majority stockholder of PHA, the ultimate parent of this Debtor, notwithstanding that his stock was in escrow with Killion for more than ten years. The 1985 transaction depended on the ability of ESOP to pay for Cohen's stock in PHA valued at $13.8 million. Moreover, this record certainly warrants the conclusion that the ESOP formed in 1985 was not implemented during the relevant years, including the year 1995, and the PHA stock which was supposed to be sold to ESOP is yet to be paid for and is supposed to be paid for as part of a plan for reorganization. Even assuming for the purpose of discussion, without conceding that the Cohen sale was in fact closed and the stock in PHA is now owned by ESOP, the sale of the stock did not occur until several months after J.I.T. acquired the REIT claim. By its own terms, the Settlement Agreement which was intended to transfer the PHA stock to ESOP did not become effective until the execution of each of the parties to the agreement. The Settlement Agreement was not executed until some time after December 18, 1985 and possibly as late as July 1996.

J.I.T. was formed by Cohen and Cohen is the sole stockholder of the corporation. J.I.T. had no capitalization and prior to the acquisition of the REIT claim and the Cohen judgment, it had no assets or liabilities. Although Cohen contends that the funds were contributed in part by his wife, Hanna, the fact remains that Cohen was the sole and dominant principal of J.I.T. and certainly a key player in the acquisition of the REIT claim and the judgment against himself.

The evidence certainly leaves no doubt that at least up to and including December 1995, Cohen was in full control of the affairs of the Debtor and his characterization that he merely acted as a consultant is a gross understatement. Cohen participated in the Debtor's most crucial decisions including the decision to file the Petition for Relief in the Bankruptcy Court; the decision to fire the Hospital's assistant administrator; the formation and funding of the Debtor's first and second plans of reorganization. Cohen was a director of the Debtor all through the months following the filing of the petition at least until December 1995. Cohen also acted, post-petition as a director of PHA, the Debtor's ultimate parent, and owned 99% of the stock of PHA and through this ownership, also the stock of the Debtor. According to the Statement of Financial Affairs filed by the Debtor's affiliates, PHF, the immediate parent of the Debtor, and PHA, the ultimate parent of the Debtor, both Cohen and his wife were insiders of those entities and in turn insiders of the Debtor.

## LEGAL PRINCIPLES GOVERNING EQUITABLE SUBORDINATION

The remedy of equitable subordination existed well prior to the Bankruptcy Code and was expressly preserved when Congress enacted the Code. The Code provides as follows:

§ 510 Subordination

· · · · ·

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate. 11 U.S.C.A. § 510 (West 1993).

It is well recognized that even before the enactment of the Code the "judicially created doctrine of equitable subordination developed as a policy against fraud and the breach of the duties imposed on a fiduciary of the bankrupt." *In re Fabricators, Inc.,* 926 F.2d 1458 (5th Cir.1991) (citing *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939)). The doctrine received extensive treatment by courts even before the Code.

In this case, the Supreme Court held that directors dealing with the corporation may be set aside on "slight grounds" under a doctrine founded upon "the soundest morality." In the case of *Washburn v. Green*, 133 U.S. 30, 10 S.Ct. 280, 33 L.Ed. 516 (1890), the Supreme Court stated that courts of equity would regard with a "large measure of watchful care" all transactions by officers, directors, and stockholders with their corporation and "unless satisfied by proof that the transaction was entered into in good faith, with a view to the benefit of the company as well as its creditors and not solely with the view to his own benefit, they (courts of equity) refused to lend their aid to its enforcement." Thus, the use of powers by an insider for personal gains or advantage to the detriment of the creditors or of the corporation would constitute a "wrong" which equity would undo or intervene to prevent.

■ The most often cited case dealing with this subject is the case of *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir.1977). This decision is binding precedent in this Circuit under *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981). In *Mobile Steel* the Fifth Circuit established a three-prong test for determining whether equitable subordination is appropriate:

(1) The claimant must have engaged in some type of inequitable conduct;

(2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and

(3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

The Eleventh Circuit adopted the *Mobile Steel* test in *In re Lemco Gypsum, Inc.*, 911 F.2d 1553 (11th Cir.1990). In *Lemco* the Court of Appeals affirmed the District Court and held that subordination of a claim asserted against a corporation by an insider, except the amount actually paid for the claim, was proper and was in conformity with the Bankruptcy Code, citing *Mobile Steel, supra.*

The question whether an insider who purchases a claim against his own corporation is fully subrogated to the original holder of the claim has been considered in the case of *In re Papercraft Corp.*, 187 B.R. 486 (Bankr. W.D.Pa.1995). In *Papercraft* the Court stated that "although directors may purchase claims against their corporation when the corporation is solvent, they are not entitled to do so at a discount and enforce the claims at full value when the corporation is insolvent or has filed bankruptcy." In the case of *In re UVAS Farming Corp.*, 91 B.R. 575 (Bankr.D.N.M.1988), the Bankruptcy Court held that when a director purchases a claim against the bankrupt corporation, he should be entitled to recover on that claim only to the extent he paid for it.

■ In the present instance, it is without dispute and it is admitted that J.I.T. was and is an insider of the Debtor. It is equally true that at the time J.I.T. acquired the claim from REIT and the judgment against Cohen, Cohen was also an insider. Contrary to the protestations of Cohen, this record belies the proposition that he was merely a passive bystander and not a major player from day one in all the affairs of the corporation including the Debtor. This being the case, the conclusion is inescapable that Cohen, using his position as a dominant player, reaped a great windfall by purchasing the REIT claim with a face amount of $1 million for $750,000 and most importantly paid off a $500,000 judgment against himself.

Even assuming without admitting that Cohen's conduct in connection with the acquisition of the mortgage from REIT was an appropriate and fair business decision, a point supported to some extent by this record, is really of no consequence for the following reasons. It is true that the REIT mortgage at the time Cohen acquired it was already in default and the one and only asset of the Debtor would have been in real danger of being lost through a foreclosure proceeding. Thus, to that end, Cohen's acquisition of the mortgage through J.I.T. did benefit the estate.

However, it is equally true and clear that Cohen only paid $250,000 for the mortgage because the total $750,000 paid also paid for a perfectly good and valid judgment against him which was clearly and solely to his benefit. It would be grossly unfair to permit

Cohen now, through J.I.T., to have a secured claim allowed even in the amount of $750,000, let alone the full amount of $1 Million, the face amount of the claim.

For these reasons this Court is satisfied that J.I.T. is entitled to have a secured claim allowed in the amount of $250,000 and the balance of his claim allowed as a general unsecured claim but subordinated to all allowed secured claims in this Chapter 11 case.

Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED that Psychiatric Hospitals of Pennsylvania's Motion to Equitably Subordinate the Claim of J.I.T., Inc. be, and the same is hereby, granted and J.I.T. is hereby entitled to a secured claim in the amount of $250,000. The balance of the claim is allowed as a general unsecured claim, subordinated to all allowed secured claims in this Chapter 11 case.