**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: SOUTHERN TEXTILE KNITTERS,
                          *Debtor.*

---

ANDERSON & ASSOCIATES, PA,
                          *Appellant,*

and

ROBERT F. ANDERSON, Trustee,
                          *Trustee-Appellant,*

v.

SOUTHERN TEXTILE KNITTERS DE
HONDURAS SEWING INCORPORATED,
          *Party in Interest-Appellee,*

and

SAMUEL H. SIMCHON; LEVY SIMCHON;
REBECCA SIMCHON; ODED SIMCHON;
OLD FORT INDUSTRIAL PARK LLC;
HAVA SIMCHON; BAY ISLAND
SPORTSWEAR INCORPORATED,
                  *Creditors-Appellees,*

and

SOUTHERN TEXTILE KNITTERS OF
GREENWOOD, INCORPORATED,
                  *Debtor-Appellee.*

No. 01-2369

In Re: SOUTHERN TEXTILE
KNITTERS OF GREENWOOD,
INCORPORATED,

*Debtor.*

---

ANDERSON & ASSOCIATES, PA,
                *Appellant,*

and

ROBERT F. ANDERSON, Trustee,
                *Trustee-Appellant,*

v.

SOUTHERN TEXTILE KNITTERS DE
HONDURAS SEWING INCORPORATED,
        *Party in Interest-Appellee,*

and

SAMUEL H. SIMCHON; LEVY SIMCHON;
REBECCA SIMCHON; ODED SIMCHON;
OLD FORT INDUSTRIAL PARK LLC;
HAVA SIMCHON; BAY ISLAND
SPORTSWEAR INCORPORATED,
                *Creditors-Appellees,*

and

SOUTHERN TEXTILE KNITTERS OF
GREENWOOD, INCORPORATED,
                *Debtor-Appellee.*

No. 02-1365

Appeals from the United States District Court
for the District of South Carolina, at Anderson.
Margaret B. Seymour, District Judge.
(CA-00-3426-8-24, BK-98-7203-W, CA-01-312-8-24)

Argued: September 23, 2002

Decided: January 16, 2003

Before WILKINSON, Chief Judge, TRAXLER, Circuit Judge, and Claude M. HILTON, Chief United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Affirmed in part, reversed in part, and remanded by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Henry Flynn Griffin, III, ANDERSON & ASSOCIATES, P.A., Columbia, South Carolina, for Appellants. Robert L. Widener, MCNAIR LAW FIRM, P.A., Columbia, South Carolina, for Appellees. **ON BRIEF:** Michael M. Beal, MCNAIR LAW FIRM, P.A., Columbia, South Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Anderson & Associates, P.A. and Robert F. Anderson (collectively "Trustee") filed suit as Trustee in bankruptcy against Samuel Simchon and multiple related parties (collectively "Defendants") who had all been connected to Southern Textile Knitters, Inc. ("Debtor") before its bankruptcy. Trustee argued that Defendants had fraudulently misappropriated large sums of cash and inventory from Debtor while they were in control of its activities. The bankruptcy court rejected Trustee's major substantive claims, found in favor of Trustee on certain minor counts, and sanctioned Trustee's counsel for improperly maintaining certain claims without sufficient foundation. The dis-

trict court upheld the bankruptcy court's decision. We affirm in part and reverse in part.

## I.

Debtor was incorporated in October 1988. Its principal business was the manufacture and sale of T-shirts. From the date of incorporation, it was a closely held corporation with the sole ownership stake split between the company's president, Samuel Simchon, his father Levy Simchon, his mother Rebecca Simchon, and his brother Oded Simchon; those four also made up the Board of Directors. Samuel's sister Hava Simchon was a commission salesperson but did not serve as an officer or director.

Historically, Debtor was a very successful company. During FY 1995, Debtor had a net income of $2.3 million on $20.8 million in revenues, with assets exceeding liabilities by $2.8 million. In the wake of NAFTA, however, Debtor's competitors began to move off-shore to take advantage of cheap labor. By 1996, virtually all of them were offshore, and the resulting shift in industry cost structure led to a serious downturn in Debtor's financial situation. After an attempt in late 1995 to subcontract some operations to a Mexican manufacturer failed, Debtor's shareholders decided, on the advice of American and Honduran counsel, to create a Honduran corporation which would sew cut parts into finished goods. Southern Textile Knitters de Honduras, Inc. (STKH) was formed in March 1997, with Samuel owning 99% of the shares and Levy owning the remaining 1%. Debtor paid all of STKH's operating costs and also shipped sewing equipment and inventory to STKH, retaining title to both. In return, STKH provided sewing services to Debtor at cost. STKH was contractually obliged to pay Debtor $3,000 per month for the sewing equipment, but that rent was never paid. Debtor saved at least $600,000 by using STKH, lowering its net sewing costs by approximately half.

In October 1997, Debtor transferred its 1/3 equity interest in Excel Dyeing and Finishing, Inc. ("Excel") to Samuel as a bonus. The Excel shares had been purchased for $75,000 and were valued in September 1997 at $107,000. In addition to the bonus, Samuel also received $141,000 in salary during Debtor's final year of solvency.

Debtor's financial situation continued to deteriorate, however. By FY 1997, its revenues had fallen to $13 million and it was operating at essentially no profit. In June 1998, Debtor's principal lender, SouthTrust Savings, terminated Debtor's line of credit because of continued deterioration in Debtor's financial condition. Bay Island Sportswear, Inc. (a corporation 100% owned by Samuel) subsequently purchased SouthTrust's outstanding claim on Debtor's assets, which Samuel had personally guaranteed. And Samuel began to personally infuse cash into Debtor so that it could continue to operate. Relying on the advice of counsel, Samuel purchased products from Debtor and resold them to Debtor's customers when he was able to do so. However, Debtor did not reduce the inventory listed on its books to reflect these sales, so the inventory remained listed as an asset on Debtor's books. Samuel then formed Southern Textile Knitters of Greenwood, Inc. (STKG) with himself as sole shareholder. He transferred all the inventory he purchased from Debtor to STKG and used STKG as the vehicle to sell the purchased products to Debtor's existing customers. The inventory that Samuel purchased was identified and physically segregated from Debtor's remaining inventory, but was not moved from Debtor's warehouses. STKG closed down soon after it sold all of the products Samuel purchased from Debtor. In total, this maneuver gave Debtor an $850,000 cash infusion essentially straight from Samuel's pockets.

Despite these maneuvers, Debtor was unable to reverse its financial position. After negotiations for debt restructuring failed, creditors filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code. Debtor consented to the relief sought in September 1998. Schedules filed by Debtor during the bankruptcy proceedings indicate that Debtor was insolvent at that time by roughly $2 million. Debtor also had $2.4 million less inventory on hand than Trustee's analysis of the books suggested should be present.

Robert F. Anderson was appointed as Trustee in September 1998 and has served as Trustee since that time. In January 1999, Trustee filed this lawsuit. After being amended twice, Trustee's complaint named the following defendants: Samuel, Levy, Rebecca, Oded, Hava, Renee Simchon (Samuel's wife), STKG, STKH, Excel, Center Pointe Construction (a corporation 100% owned by Renee), Old Fort Industrial Park (a corporation 96% owned by Samuel), and Bay

Island. Trustee sought the following relief: (1) turnover of assets pursuant to 11 U.S.C. § 542; (2) avoidance of preferential transfers under 11 U.S.C. § 547; (3) avoidance of fraudulent transfers under 11 U.S.C. § 548; (4) avoidance of post-petition transfers pursuant to 11 U.S.C. § 549; (5) damages for breach of fiduciary duty; (6) piercing the corporate veil; (7) damages for aiding and abetting; (8) damages for conversion; (9) avoidance of fraudulent transfers under S.C. Code § 27-23-10; (10) damages for civil conspiracy; (11) subordination of claims; (12) accounting of assets; (13) payment of rent due by STKH; and (14) payment of money owed by Hava.

The charges against Hava were tried separately, and the bankruptcy court granted judgment in favor of Hava in March 2000. In January, March, and April 2000, the bankruptcy court dismissed all causes of action against Levy, Rebecca, Oded, Renee, Center Pointe, Old Fort, and Bay Island. On July 19, the bankruptcy court dismissed all remaining causes of action which required Debtor to have been insolvent before July 31, 1998. On July 29, the bankruptcy court granted judgment under Rule 52 in favor of the remaining defendants — Samuel, STKH, and STKG — on all remaining charges except three. It found in favor of Trustee on the claims for turnover of the equipment used by STKH, conversion of the equipment used by STKH, and rent due for the equipment used by STKH. It therefore required Defendants to return the sewing equipment from STKH and pay the accrued rent. The district court affirmed the bankruptcy court on all counts, holding that the bankruptcy court's application of the wrong legal standard on some of the claims was harmless error.

On August 18, the bankruptcy court fined Trustee's counsel $1,000 for failing to withdraw Trustee's claim against Old Fort. On November 21, the bankruptcy court fined Trustee's counsel $750 for pursuing claims that required insolvency before July 31, 1998 as a necessary element. The district court upheld these sanctions in two separate rulings.

## II.

The district court's decision is reviewed de novo. *In re Weiss*, 111 F.3d 1159, 1166 (4th Cir. 1997). We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *Id.*

### III.

Trustee brings claims against Samuel, Levy, Rebecca, Oded, Renee, STKG, and STKH under several causes of action involving fraud or unfairness, including breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and fraudulent transfer under S.C. Code § 27-23-10 and 11 U.S.C. § 548(a)(1)(A). As discussed by the bankruptcy court, all of these claims involve at their core the allegation that Defendants' behavior in this case was improper. *See In re Southern Textile Knitters, Inc.*, 2000 WL 33709685 (Bankr. D.S.C. July 27, 2000). Thus, if the bankruptcy court was correct that none of Defendants defrauded Debtor or dealt with it in even an arguably improper fashion, none of these claims can stand. We therefore review that finding.

### A.

Trustee's contentions of fraud and unfair dealing center on his characterization of a series of transactions between Debtor, Samuel, STKG, and STKH as fraudulent or bad-faith transfers from Debtor to insiders. Trustee points specifically to the transfer of inventory and operating funds to STKH, the sale to Samuel and STKG of inventory from Debtor's warehouses, and the payment of a salary and stock bonus to Samuel.

Trustee contends that these transfers must be avoided as fraudulent. *See* 11 U.S.C. § 548(a)(1)(A) (2002) (transfers completed within one year of the bankruptcy petition may be avoided if made "with actual intent to hinder, delay, or defraud any entity to which the debtor was . . . indebted"); S.C. Code § 27-23-10(A) (2002) ("Every . . . transfer . . . [made] for any intent or purpose to delay, hinder, or defraud creditors . . . must be deemed . . . to be clearly and utterly void"). He also argues that they constituted a breach of fiduciary duty. *See* S.C. Code § 33-8-300(a) ("A director shall discharge his duties . . . in good faith . . . [and] in a manner he reasonably believes to be in the best interests of the corporation and its shareholders."). And he contends that the fraudulent nature of these transfers justifies piercing the corporate veil so that creditors can pursue their claims directly against the individual Defendants. *See Parker Peanut Co. v. Felder*, 20 S.E.2d 716, 720 (S.C. 1942) ("Where . . . the corporate fiction is urged for fraudulent

or perverted purposes, the courts may properly disregard it and look to the responsible human beings . . . who compose the corporation and are hidden behind the juristic screen.") (citations omitted).

The bankruptcy court, however, held that the key decisions challenged by Trustee were made by Defendants as part of a bona fide effort to save Debtor in the face of rapidly changing market conditions. The bankruptcy court's finding was based on a careful, extensive, credibility-based review of testimony and evidence presented by the parties. We see no clear error in this finding and therefore affirm the trial court's rejection of the fraudulent transfer and breach of fiduciary duty charges, as well as its refusal to pierce the corporate veil.

The court found that Debtor temporarily transferred inventory to STKH for assembly into salable finished goods and sent equipment and cash to STKH to cover the local costs of that assembly. This was simple and straightforward production outsourcing; as the bankruptcy court noted, "[t]he transfer of inventory and operating funds to STKH appear[s] to be a result of Debtor's attempt to move its sewing operation off-shore to reduce its costs" and stay competitive with other T-shirt manufacturers. *In re Southern Textile Knitters*, 2000 WL 33709685, at *20. Indeed, STKH lost $180,000 on $635,000 in revenues during 1998, and its liabilities were greater than its assets at the end of that year. It was not clearly erroneous for the bankruptcy court to hold that these transactions were proper.

Similarly, the bankruptcy court did not commit clear error in holding that the sale of inventory to Samuel and STKG was a stopgap effort to generate cash to keep the company afloat. The bankruptcy court specifically held that "the transfer of inventory to [Samuel] and STKG [was] an attempt [to] pay down SouthTrust's loan . . . and to aid Debtor during its financial downturn," and further that "STKG ultimately purchased the inventory and sold it to third parties *at no profit*." (emphasis added). *In re Southern Textile Knitters*, 2000 WL 33709685, at *20. And like STKH, STKG also "lost considerable amounts of money during its short existence." *Id.* at *11. These findings were sufficient to justify the bankruptcy court's conclusion that the inventory sales were not improper.

Finally, the court did not clearly err in its conclusion that Samuel's yearly salary and bonus — less than $250,000 for the head of a $13

million company which had historically been very profitable — represented good faith "compensation and bonus for his services." *Id.* at *20.

## B.

Trustee claims that, even failing a finding of fraudulent behavior with respect to any of the specific challenged transactions, there is nonetheless a smoking gun proving that major impropriety took place: $2.4 million in inventory vanished from Debtor's books without explanation. That this inventory was misappropriated is apparent, he claims, from the application of simple arithmetic. On July 31, 1998, there was $3.7 million of inventory listed on the books. But after Trustee was appointed in September 1998, he found only $1.3 million of inventory on hand when he liquidated the stock. Thus, Trustee argues, Defendants misappropriated roughly $2.4 million in inventory that simply vanished from the books without a trace.

The bankruptcy court's careful analysis of the facts, however, demonstrates that Defendants sufficiently explained the $2.4 million discrepancy. *See In re Southern Textile Knitters*, 2000 WL 33709685, at *12-15. The bankruptcy court noted that $200,000 of the alleged gap was attributable to the fact that Defendants' accounting method valued some categories of inventory differently than did the accounting method used by Trustee in September. Trustee's misidentification of some of the inventory as yarn or griege goods rather than as individual piece goods which have a higher value accounted for $205,000 of the discrepancy. A further $1,790,000 of the inventory gap was due to the fact that the inventory actually sold to Samuel had erroneously been left on the books even after Debtor actually received payment for that inventory. Between $100,000 and $200,000 more of the gap was accounted for by a collection of damaged inventory left in the warehouse but not included in the September accounting. And any remaining discrepancy was accounted for by the fact that some 20,000 pounds of yarn had not yet been liquidated when the September accounting took place, and also by the fact that Debtor made some sales of inventory after the July 31 accounting.

Defendants have thus adequately accounted for the discrepancy between their figures and Trustee's figures. There is no inventory gap, and no smoking gun.

C.

Trustee further claims that the bankruptcy court used the wrong burden of proof in resolving the claims of breach of fiduciary duty and fraudulent transfer. Trustee argues that the findings discussed above should therefore not be insulated by the "clearly erroneous" standard of review. *See In re K & L Lakeland, Inc.*, 128 F.3d 203, 206 (4th Cir. 1997); *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1526-27 (4th Cir. 1984).

Ordinarily, the plaintiff bears the burden of proof with claims such as those brought by Trustee. Under S.C. Code § 33-8-310, however, the burden of proving the fairness of a conflict of interest transaction (one in which a director of the corporation has a direct or indirect interest) lies on the party seeking to defend the transaction. The burden of proof can be shifted back to the party challenging the transaction in one of two circumstances: if the transaction was ratified by a majority of the disinterested directors, or if it was ratified by a majority of the disinterested shareholders. S.C. Code § 33-8-310 (2002). Since Debtor's directors ratified the transfers challenged here, the bankruptcy court held that the burden was shifted back to Trustee to prove that the transfers were fundamentally unfair.

This ruling was incorrect. By the terms of S.C. Code § 33-8-310, the transfers challenged in this case were not approved by a disinterested board because the members of that board were Samuel's immediate family. *See id.* at comment 5 (stating that a director should be viewed as interested if he or his family members have a financial interest in the transaction). Under South Carolina law, the burden should therefore have remained on Defendants. This means, Trustee asserts, that the bankruptcy court's findings of fact are not insulated from review by the clearly erroneous standard, since the court did not actually find by a preponderance of the evidence that Defendants' actions were fundamentally fair.

With respect to the transfers to STKG, the transfers to STKH, and Samuel's compensation, however, the bankruptcy court did in fact put the burden on Defendants to prove the underlying fairness of the transactions. It is true that, in its analysis of the breach of fiduciary duty claim, the court erroneously placed the burden on Trustee. How-

ever, in its separate analysis of the fraudulent transfer claims, the bankruptcy court clearly put the burden on Defendants. It specifically noted that the "burden of proof rests with Defendants to meet the requirements" of proving the bona fides of these transactions. *In re Southern Textile Knitters*, 2000 WL 33709685, at *19. And the fraudulent transfer claims hinged on precisely the same underlying factual events as the fiduciary duty claims: the STKG transfers, the STKH transfers, and Samuel's compensation. On each of these counts, placing the burden on Defendants to prove their case, the bankruptcy court found that their behavior was fair and in good faith. *Id.* at *20-22 (holding that conveyances "were [not] intended to defraud creditors"). Thus, the court *did* make the factual findings critical to its fiduciary duty analysis under the correct burden of proof — even if only in another section of its opinion.

We are also satisfied that a different burden of proof would not have affected the lower court's rejection of Trustee's allegation that $2.3 million dollars of inventory is unaccounted for.

To begin with, it is certain that the court would have found that $1.8 million of that alleged gap was appropriately accounted for under either burden of proof. In its separate Findings of Fact, applicable to every section of its opinion, the court found that "the sales of inventory from Debtor to [Samuel] were not reflected in Debtor's books and records by a respective reduction in inventory" even though Debtor received full payment from Samuel for those transfers. *Id.* at *8. Its subsequent discussion of the alleged $2.3 million gap explicitly relied on that earlier and separate finding: since the inventory sold to Samuel "had not been removed from the inventory numbers carried on Debtor's books and records," the July 31 figures on which Trustee relies are overstated by the amount at which that inventory was valued — roughly $1.8 million dollars.[1] *Id.* at *12.

---

[1] Trustee argues that Samuel's payment of $850,000 for this inventory demonstrates fraud in itself. However, the bankruptcy court noted that the discrepancy between the two values was due to the average cost basis of Debtor's accounting on its books. *In re Southern Textile Knitters*, 2000 WL 33709685, at *12 n.11. More important, the bankruptcy court also found (in a section of its opinion where it had clearly placed the burden on Defendants) that Samuel resold the inventory to Debtor's existing customers "*at no profit*." *Id.* at *20 (emphasis added). This was sufficient evidence for the court's conclusion that Samuel's purchase of the inventory was not made in bad faith. *Id.*

With respect to the remaining $500,000 in allegedly missing inventory, it is apparent from both the logic of Defendants' explanation and from the overall context of the bankruptcy court's rulings that the bankruptcy court would have given equal credence to Defendants' careful and logical explanation of the facts under any burden of proof. In more than five lengthy rulings on charges relating to Defendants' behavior during Debtor's final year of existence, the bankruptcy court judge rejected every single specific allegation of fraud or unfair dealing. It did so both when the burden was on Defendants and when the burden was on Trustee. It did so with heavy reliance on judgments about witness credibility and demeanor, an aspect of fact finding which appellate courts are particularly ill equipped to second-guess. If the bankruptcy court had harbored questions about the alleged $2.3 million gap, it is difficult to imagine that it would have found Defendants credible in their arguments on every single other count, as it obviously did. Ultimately, it is clear to this court that the bankruptcy judge believed Defendants to have been motivated by a sincere desire to save their family business from ruin; this sense pervades the Findings of Fact as well as the court's specific Findings of Law.

## IV.

Trustee further brings a claim of constructive fraud under both S.C. Code § 27-23-10(A) and 11 U.S.C. § 548(a)(1)(B), challenging the transfer of inventory and operating funds to STKH, the transfer of inventory and business to STKG, and the transfer of a salary and bonus to Samuel. We address each statutory ground in turn.

## A.

Under § 27-23-10, more commonly known as the Statute of Elizabeth, an action lies for constructive fraudulent transfer if (1) debtor makes a transfer but does not receive "valuable consideration" in return; (2) debtor was indebted to the plaintiff at the time of transfer; and (3) debtor does not have sufficient property to pay his debt to plaintiff in full. *Future Group, II v. Nationsbank*, 478 S.E.2d 45, 48-49 (S.C. 1996). If all three conditions are met, the transfer will be set aside as a fraudulent conveyance. *Id.* Since the transfers at issue here were made to members of the family, Defendants have the burden to establish "both a valuable consideration and the bona fides of the

transaction by clear and convincing testimony." *Windsor Props., Inc. v. Dolphin Head Constr. Co.*, 498 S.E.2d 858, 860 (S.C. 1998) (citations omitted).

Noting that the "burden of proof rests with Defendants" to meet these requirements, the bankruptcy court held that Defendants had established by clear and convincing evidence that each transfer was reciprocated with valuable consideration. *In re Southern Textile Knitters*, 2000 WL 33709685, at *19 (citing *Windsor Props.*, 498 S.E.2d at 861). That conclusion was sufficiently supported by the evidence. As discussed above, Debtor received $850,000 in desperately-needed emergency capital in exchange for the inventory it sold to Samuel. The fact that Samuel then sold this inventory at no profit to Debtor's existing customers is sufficient to support the conclusion that the price he paid was the market price. Similarly, the shipments of money and inventory to STKH were compensated by STKH's sewing those goods into finished parts. Indeed, the STKH outsourcing saved Debtor roughly half of what its costs would have been in the United States — a profitable exchange for Debtor by any measure. *Id.* at *9. And the district court's conclusion that Samuel's services as President of Debtor were consideration for his salary and stock bonus was also reasonable in light of Samuel's position with the company, Debtor's size, and Debtor's historic success.

Thus, since these transfers were supported by valuable consideration, they may not be set aside under the Statute of Elizabeth.

### B.

Under 11 U.S.C. § 548(a)(1)(B), a transfer by Debtor of any interest in property may be avoided if two elements are satisfied. First, Debtor must have "received less than a reasonably equivalent value in exchange for such transfer." 11 U.S.C. § 548(a)(1)(B) (2002). Second, the transfer must either have been made while Debtor was insolvent, or have itself rendered Debtor insolvent. *Id.* The district court rejected Trustee's claims under this statute because it held that Debtor had been solvent through July 31, 1998.

Because this finding was not clearly erroneous, we affirm. The evidence presented by George DuRant, Trustee's expert witness, tended

to establish that Debtor was solvent as of July 31, 1998. He cited Debtor's internal financial statements from June 30, 1998 which showed Debtor to be solvent at that time, and he did not suggest that anything happened during July to change that status. This was sufficient evidence to support the bankruptcy court's finding.

## V.

Trustee also seeks to avoid the transfers of inventory and business to Samuel and STKG as preferential transfers under 11 U.S.C. § 547(b). That statute is intended to promote the "prime bankruptcy policy of equality of distribution among creditors" and to "discourage[ ] creditors from attempting to outmaneuver each other in an effort to carve up a financially unstable debtor." *In re Barefoot*, 952 F.2d 795, 797-98 (4th Cir. 1991) (citations omitted). It allows a trustee in bankruptcy to avoid any transfer:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (2002). The district court rejected this claim based on its finding that Debtor had been solvent until at least July 31, 1998. We affirm on different grounds.

Section 547(c)(1) provides an exception to this general rule of preferential transfers. Courts may not use § 547 to avoid any transfer which was intended to be part of a "contemporaneous exchange for new value given to the debtor" and which actually was "in fact a substantially contemporaneous exchange." 11 U.S.C. § 547(c)(1) (2002). "New value" is defined as any "money or money's worth in goods, services, or new credit." 11 U.S.C. § 547(a)(2) (2002). This rule makes sense for two reasons: it encourages business partners to continue doing business with troubled debtors (potentially enabling them to avoid bankruptcy altogether), and it does not adversely affect other creditors because Debtor's estate receives new value in exchange for the money or property it gives up. *In re Jones Truck Lines*, 130 F.3d 323, 326 (8th Cir. 1997).

This exception applies to the inventory transfers from Debtor to Samuel. The bankruptcy court explicitly found that Samuel "purchase[d] products from Debtor for cash in an effort to alleviate Debtor's cash flow problem." *In re Southern Textile Knitters*, 2000 WL 33709685, at *6. It held that Samuel and Debtor, on the advice of corporate counsel, intended the cash purchases to be payments for an immediate property exchange rather than temporary loans. *Id.* at *6-8. This finding was based on the trial court's assessment of witness credibility, and it was not clearly erroneous. The transfers of inventory to STKG and Samuel therefore may not be avoided under 11 U.S.C. § 547(b).

## VI.

Trustee further challenges the bankruptcy court's ruling that payments made to Hava did not violate the Statute of Elizabeth's prohibition on transfers made "for any intent or purpose to delay, hinder, or defraud creditors." S.C. Code § 27-23-10(A) (2002).[2] He argues that

---

[2]Trustee does not challenge the bankruptcy court's ruling that, in the absence of fraud, South Carolina law does not require employees to

the bankruptcy court should have required Hava to prove by clear and convincing evidence that she gave valuable consideration in exchange for her salary. We agree, and therefore remand this issue to the bankruptcy court for a determination of that issue under the proper burden of proof.

When considering transfers to a family member under the Statute of Elizabeth, "the burden of proof shifts to the transferee to prove both that valuable consideration was exchanged between the parties and the bonafides of the transaction." *In re Haddock*, 246 B.R. 810, 816 (Bankr. D.S.C. 2000). Furthermore, "[e]ach must be established by clear and convincing evidence, not mere preponderance of the evidence." *Id.*; *see also Windsor Props.*, 498 S.E.2d at 860. In this case, the bankruptcy court stood this cause of action on its head and placed the burden of proof on Trustee to prove his case rather than on Hava to disprove it by clear and convincing evidence. This was reversible error.

Defendants respond that the court would have reached the same result under the correct burden of proof. We decline to make that assumption, particularly because of the very large gap between the burden of proof that should have been applied and the burden of proof that was actually applied. Our hesitation to do so is reinforced by the existence of evidence which, depending on the bankruptcy court's credibility assessment, could have supported a verdict for Trustee on this claim.

In particular, Hava's pre-trial deposition could give rise to the inference that she did not do any real work for Debtor during the years that she was receiving a paycheck. For example, the following exchange took place during her deposition:

> Q:  [D]uring 1997, I guess, was the last full year that Southern Textile Knitters was in the business; how many presentations would you say you made?

repay unearned commissions unless they have specifically agreed to do so. *See McConnell v. Banker*, 169 S.E. 842, 843 (S.C. 1933).

A: I don't recall.

Q: Approximately?

A: I don't recall.

Q: Was it less than 10?

A: I don't recall.

Q: Could it be less than 10?

A: I don't recall.

Q: And do you recall how many telephone contacts you made during 1997?

A: I do not recall.

Q: Approximately?

A: I have no idea.

Q: Was it less than a hundred?

A: I do not recall.

. . . .

Q: All right, who was your supervisor during 1997?

A: I believe it was Al Bollinger, but I'm not a hundred percent sure."

. . . .

Q: All right, and during 1997, how many times did you talk to Mr. Bollinger, if at all?

A: I do not recall.

Q:  Well, would you generally talk to him once a month, or once a week or every day; how — how frequently would you talk to him?

. . . .

A:  I don't recall.

Q:  Do you know any of the other salesmen that worked at Southern Textile Knitters during 1997?

A:  I think Jean Price, but she's the only one that I recall.

. . . .

Q:  All right, during 1997, how many sales meeting [sic] would you say you attended?

A:  I don't recall.

. . . .

Q:  In 1997, how many clients did you have, how many customers?

A:  I don't recall.

Q:  Approximately?

A:  I don't recall.

Q:  Would you say it's more than 10 or less than 10?

A:  I don't recall.

Q:  Who was your best customer during 1997?

A:  I don't recall.

Q:   Do you know the names of any of your customers during 1997?

A:   I don't recall.

Similar concerns apply to the bankruptcy court's assessment of other evidence and testimony at Hava's trial. At the time her employment was terminated, it appears that Hava had received advances on future commissions larger than any other sales representative — arguably a year and a half of as-yet unearned pay. Testimony from that trial could support the conclusion that Hava was one of only two sales representatives who even received any advances on future commissions. She apparently kept no paper records of her daily activities as sales representative for Debtor. And her highly specific testimony on direct examination at trial about her responsibilities, customer connections, and activities as sales representative could be seen as inconsistent with her earlier inability to remember even the most basic details about her job.

On remand, the bankruptcy court may well still decide in favor of Hava. This issue, after all, turns on questions of credibility, intent, and other subjective factors which the trial court is in a far better position to assess than we are. But the gap between requiring clear and convincing evidence from Hava that she acted properly and requiring Trustee to prove that she acted improperly is too large for us to ignore.

## VII.

Trustee further contends that the bankruptcy court was wrong to dismiss on summary judgment the contention that Bay Island's claim on Debtor's assets should be equitably subordinated. We decline to reverse the bankruptcy court on this ground.

A creditor's claim can generally be subordinated under 11 U.S.C. § 510(c) if three circumstances are satisfied: (1) the claimant engaged in inequitable conduct; (2) that conduct injured other creditors; and (3) subordination is consistent with other bankruptcy law. *In re ASI Reactivation, Inc.*, 934 F.2d 1315, 1320 (4th Cir. 1991); *see also U.S.*

*v. Noland*, 517 U.S. 535, 538-39 (1996) (holding that § 510(c) was intended to incorporate existing doctrine of equitable subordination as exemplified by *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977)).

Trustee suggests three grounds on which Bay Island's claim should be equitably subordinated. We reject each of them. First, he argues that Bay Island initially submitted an excessive claim on Debtor's estate before revising it downwards to an acceptable figure. But the bankruptcy court held that the reduction of Bay Island's claim did not demonstrate prior inequitable behavior, since Bay Island had openly explained that the higher figure included certain funds in which STKG had a claim. *In re Southern Textile Knitters, Inc.*, No. 98-07203-W, slip op. at 3 (Bankr. D.S.C. Jan. 5, 1999). Second, Trustee argues that because Samuel had personally guaranteed the SouthTrust claim, giving equal priority to Bay Island's claim would grant Samuel a windfall. In support of this argument, Trustee cites *In re Psychiatric Hosp. of Hernendo, Inc.*, 207 B.R. 276 (Bankr. M.D. Fla. 1997). The insider's claim was partially subordinated in that case, however, because he had purchased a creditor's claim for 25% of its value and sought to collect on the entire claim — not because he had also purchased the creditor's separate claim on his own assets. *Id.* at 281-82. South Bay, by contrast, seeks only to recover what it actually paid. Third, Trustee argues that Samuel's conversion of sewing equipment to STKH qualifies as inequitable conduct sufficient to justify subordination. However, the bankruptcy court did not view Samuel's conduct as sufficient to support a finding of inherent unfairness under fiduciary duty analysis. We are not inclined to disturb its judgment.

In the final analysis, there simply is no injury to Debtor's other creditors here. Bay Island merely stands in the shoes of SouthTrust: it can receive only what SouthTrust could have received. We decline to reverse the bankruptcy court's refusal to equitably subordinate Bay Island's claim.

## VIII.

Trustee argues that Samuel should be personally responsible for the unpaid rent on the sewing equipment that was temporarily transferred from Debtor to STKH. Trustee, however, does not contend that Samuel was a party to the rental contract between STKH and Debtor;

indeed, the trial court's order makes it clear that "the rent [is] owed by *STKH*." *In re Southern Textile Knitters*, 2000 WL 33709685, at *17 (emphasis added). And for the reasons discussed in Part III, we decline to pierce the corporate veil with respect to any of the companies involved in this case. We therefore hold that Samuel may not be held personally liable for the unpaid rent.

## IX.

The bankruptcy court also sanctioned Trustee's counsel for two separate aspects of his conduct during the litigation. Trustee appeals those rulings. We review each ruling in turn.

A bankruptcy court's order of sanctions may be overruled if it is an abuse of discretion. It is an abuse of discretion for a trial court to "base[ ] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405 (1990).

## A.

The bankruptcy court sanctioned Anderson & Associates for its failure to withdraw Trustee's claims against Old Fort under 11 U.S.C. § 547, 11 U.S.C. § 548, and S.C. Code § 27-23-10. The sanctions were based on the court's holding that Rule 9011 of the Federal Rules of Bankruptcy Procedure requires affirmative, formal withdrawal of any claims which, though proper when made, later turn out to have no evidentiary basis.

Rule 9011(b)(3) requires all "representations to the court" either to "have evidentiary support" or to be "likely to have evidentiary support after a reasonable opportunity for further investigation." Fed. R. Bankr. P. 9011(b)(3). The bankruptcy court noted that Trustee's claims against Old Fort were "not initially frivolous" and that Trustee "refrain[ed] from making any arguments or presenting any evidence" about those claims at any point during the trial. *In re Southern Textile Knitters, Inc.*, 2000 WL 33709686, at *8 (Bankr. D.S.C., Aug 18, 2000). Indeed, apparently the only representation made by Trustee after he discovered that his fraudulent transfer claims against Old Fort

had no basis was the following: "We're not aware of any transfers to Old Fort . . . . The only [claim] that's left [to be litigated], as far as I know, as far as Old Fort, is the accounting." And the only claim against Old Fort listed in Trustee's Pre-Trial Order was a request for an accounting. Trustee's Jan. 12, 2000 Pre-Trial Order at 6-13, *In re Southern Textile Knitters, Inc.*, No. 98-07203-W (Bankr. D.S.C. 2000).

Thus, the claims were neither improper when filed nor affirmatively reiterated once their lack of evidentiary support became clear. Rather, the sanctions were levied because Defendants "fail[ed] to withdraw the allegations despite a knowledge of a lack of evidentiary support." *In re Southern Textile Knitters*, 2000 WL 33709686, at *10. Imposition of sanctions therefore hinges on the theory that Rule 9011 requires litigants to *formally* withdraw claims which were proper when made, but turn out during the course of litigation to have an insufficient evidentiary basis. The plain text of the rule forecloses this theory.[3] "Presenting to the court" is carefully defined in the rule; it includes "signing, filing, submitting, or later advocating" a meritless position. Fed. R. Bankr. P. 9011(b). It does not include failing to formally withdraw a meritless position.

### B.

The trial court also sanctioned Trustee's counsel for its pursuit of claims against Samuel for preferential transfer under § 547 and fraudulent transfer under § 548(a)(1)(B). Specifically, it sanctioned Trustee's decision to pursue those claims despite the fact that a necessary element of each is Debtor's insolvency at the time of the challenged

---

[3]Nor do the cases decided under revised Rule 9011 that were cited by the bankruptcy court support this theory. Both involved litigants who affirmatively argued positions which they knew or should have known to be meritless at the moment they argued them. *See Turner v. Sungard Bus. Sys.*, 91 F.3d 1418, 1420, 1422 (11th Cir. 1996) (lawyer explicitly "told the court that he had evidence to support" plaintiff's only claim even though he "knew from the moment he began representing Plaintiff that his claim was meritless"); *Young v. Corbin*, 889 F. Supp. 582, 586 (N.D.N.Y. 1995) (plaintiff "defaulted on his obligation under Rule 11 by submitting to the court a frivolous lawsuit").

transfers. The trial court based this ruling on two findings: first, that Trustee's counsel knew and conceded that Debtor had been solvent at least through July 31, 1998; second, that the challenged transfers all took place before that date.

The bankruptcy court stated that George DuRant, Trustee's expert witness, unequivocally and directly testified that he believed Debtor had been solvent up to at least July 31, 1998. If this were accurate, it might provide sufficient basis for the court's discretionary decision to sanction Trustee's counsel. However, it is not. DuRant explicitly stated that he did not prepare a report on insolvency. His exchange with Defendants' counsel on cross-examination is instructive in this regard:

Q: And in this case it was your intent to prepare a report to the trustee that dealt with solvency, wasn't it?

A: I was asked to.

Q: And you looked at the solvency issue, didn't you?

A: There you go, he asked me to, but I didn't do that.

Q: You didn't look at it?

A: No, I didn't prepare a report on insolvency.

. . . .

Q: Okay. You are an expert on insolvency but you are not going to tell the Court whether or not this company was solvent at any time, is that correct?

A: That's correct.

DuRant's testimony is straightforward: whatever his subsequent discussion of assumptions surrounding his calculations of misappropriated inventory, he took no position on the specific date that Debtor became insolvent. The bankruptcy court was clearly erroneous to hold otherwise.

The bankruptcy court also stated that "the parties [both] reported that there was no dispute as to the fact that the transfer of the salary and Excel stock to [Samuel] took place while Debtor was still solvent." *In re Southern Textile Knitters, Inc.*, No. 98-07203-W (Bankr. D.S.C. Nov. 21, 2000), slip op. at 20. This was also error. Defense counsel did represent to the court that "there is no dispute that [these two transfers] occurred before July 31st." And Trustee's counsel did state at the same hearing that "all the salary payments were made prior to July 31st, . . . as was [the transfer of] Excel stock." But the parties' agreement that the transfers occurred before July 31st is in no sense equivalent to a concession by Trustee that Debtor had been solvent up until that date. Trustee agreed that bankruptcy court was correct about the date of the transfer, but did not concede that Debtor had been solvent on that date.[4] The bankruptcy court erred in holding otherwise.

Since the sole basis for these sanctions was the erroneous conclusion that Trustee's counsel knew (or should have known) and conceded that Debtor was insolvent prior to July 31, 1998, we reverse the bankruptcy court's order and dismiss Defendants' motion for sanctions with prejudice.

### X.

In sum, we reverse the district court's order dismissing the claims of fraudulent transfer under S.C. Code § 27-23-10(A) against Hava Simchon. We also reverse the imposition of sanctions against Anderson & Associates. We affirm the district court's dismissal of all other claims.

The judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED*
*IN PART, AND REMANDED*

---

[4]It is notable in this regard that Defendants do not even contest this point on appeal.