*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0371p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

In Re: TRIPLE S RESTAURANTS, INC.,

*Debtor,*

---

J. BAXTER SCHILLING, Trustee,

*Appellee,*

*v.*

DONALD M. HEAVRIN,

*Appellant.*

No. 04-5297

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 03-00396—John G. Heyburn II, Chief District Judge.

Argued: May 31, 2005

Decided and Filed: August 30, 2005

Before: BOGGS, Chief Judge; GILMAN, Circuit Judge; and CLELAND, District Judge.[*]

---

## COUNSEL

**ARGUED:** James A. Earhart, Louisville, Kentucky, for Appellant. J. Baxter Schilling, Louisville, Kentucky, for Appellee. **ON BRIEF:** James A. Earhart, Louisville, Kentucky, for Appellant. J. Baxter Schilling, Louisville, Kentucky, for Appellee.

---

## OPINION

RONALD LEE GILMAN, Circuit Judge. Donald M. Heavrin appeals from the judgment of the district court, which affirmed a decision of the bankruptcy court permitting J. Baxter Schilling, the Trustee for Triple S Restaurants (TSR), to avoid the fraudulent transfer of a life

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

insurance policy and to recover the value of the transfer on behalf of TSR's creditors. The policy on the life of Heavrin's stepfather, Robert Harrod, was transferred from TSR to a trust benefitting Heavrin and his stepsister, Bobbie Bridges, shortly before TSR filed for bankruptcy. When the bankruptcy court determined that the transfer could be avoided, Heavrin and Bridges were ordered to pay the TSR Trustee the $250,000 that they had received from the insurance carrier, plus interest. The district court affirmed this decision, as well as the bankruptcy court's denial of the motion that Heavrin filed seeking to recuse the bankruptcy court judge.

On appeal, Heavrin argues that the transfer was not fraudulent because all of the proceeds from the life insurance policy had previously been assigned by TSR to the McDonnell Douglas Finance Corporation (MDFC), one of TSR's creditors, and therefore the policy was of no value to either TSR or the Trust. He also claims that the payment from MDFC, which he received through the Trust, was in settlement of unrelated lender-liability claims that Harrod's estate had against MDFC. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

# I. BACKGROUND

## A.        Factual background

In 1988, Michael Macatee and Robert Harrod formed TSR to obtain a franchise for the operation of Sizzler restaurants in Louisville, Kentucky. Each of them owned 50% of TSR's stock. Heavrin, a Kentucky lawyer who was Harrod's stepson, served as TSR's attorney.

Prior to the formation of TSR, negotiations regarding a loan had taken place between MDFC and S&B of Indiana, Inc., a predecessor in interest of TSR. The terms of a December 1987 commitment letter issued to S&B by MDFC required "Robert E. Harrod and Michael R. Macatee . . . to obtain Key Man Life Insurance in the minimum amount of $3,560,000.00 naming MDFC Equipment Leasing Corporation as beneficiary." When the loan agreement was actually executed three months later, in March of 1988, TSR was substituted for S&B. Harrod, Macatee, and TSR were all co-signers on the $3.56 million loan from MDFC, for which all three were jointly and severally liable.

Three days after securing the loan from MDFC, S&B purchased an insurance policy on Harrod's life from Transamerica Occidental Life in the amount of $2 million. S&B then transferred all of its interest in the Harrod policy to TSR. (Four policies were also obtained on the life of Macatee, each in the amount of $500,000, although the details regarding these policies are not reflected in the record.) In November of 1991, the Harrod policy from Transamerica was replaced by a $2 million policy issued by Jackson National. TSR made this substitution in order to save money on the premium payments for the Harrod policy. Shortly after the Transamerica policy was replaced by the Jackson National policy, Michael Forrester, an insurance agent and friend of Heavrin, completed a collateral assignment of the Harrod policy proceeds from TSR to MDFC.

Harrod and Macatee informed Heavrin in August of 1992 that TSR was in dire financial straits and that they wanted TSR to file a Chapter 11 bankruptcy petition. Heavrin advised them against filing for bankruptcy, instead counseling them to attempt to reach an arrangement with TSR's creditors that would enable TSR to remain in business. Less than a month later, a lawyer who shared office space with Heavrin drafted an irrevocable trust agreement (the Trust) in which Harrod was the grantor and trustee. The beneficiaries of the Trust were Heavrin and Bridges. Harrod transferred his 500 shares of TSR stock to the Trust in September of 1992.

TSR's financial condition continued to deteriorate, and, by November of 1993, it did not have the resources to make the quarterly premium payments on the Harrod policy. As a result, MDFC began to pay the premiums to ensure that the policy would not lapse. Making certain that

the premium payments were submitted promptly became even more crucial in March of 1994, when MDFC was informed that Harrod had been diagnosed with lung cancer.

In June of 1994, Heavrin told MDFC that Harrod's cancer was terminal. Shortly thereafter, TSR transferred its ownership of the Harrod policy to the Trust without receiving any financial consideration. This transfer was executed on TSR's behalf by Macatee. At the time of the transfer, TSR owed hundreds of thousands of dollars in outstanding unsecured debts and was insolvent.

Three days after the Trust became the owner of the Harrod policy, Heavrin began negotiating with MDFC for a settlement on behalf of the Trust. On September 2, 1994, while these negotiations were ongoing, Harrod died. MDFC and Heavrin signed a settlement agreement a month later, on November 3, 1994. In accordance with this agreement, MDFC, as the beneficiary of the policy, instructed Jackson National to pay $250,000 of the proceeds to the Trust. Jackson National subsequently paid the Trust the $250,000 plus a small amount of post-death interest as required by the policy. Although Heavrin and Bridges were equal beneficiaries of the Trust, they apparently agreed that Bridges would receive $75,000 and that Heavrin would keep the remainder.

## B.      Bankruptcy court proceedings

In September of 1994, TSR filed for bankruptcy protection. MDFC filed a proof of claim against TSR for $3,304,165.63 two months later. No mention is made in this document of the $2 million in life insurance proceeds that were paid as a result of Harrod's death. At oral argument, however, counsel for Heavrin acknowledged that MDFC eventually credited TSR for the $1.75 million payment that MDFC received from the proceeds of the Harrod policy. But MDFC did not credit TSR for the entire $2 million of the policy proceeds, presumably because it subtracted the $250,000 payment that it directed Jackson National to pay to the Trust.

In July of 1996, the Trustee for TSR filed suit in the United States Bankruptcy Court for the Western District of Kentucky, seeking to avoid the transfer of the Harrod policy to the Trust under 11 U.S.C. §§ 544(b) and 548(a), and to recover the $250,000 plus interest paid to the Trust by Jackson National. The TSR Trustee alleged that the payment directed by MDFC to the Harrod Trust was facilitated by the Trust's ownership of the Harrod policy. Heavrin insisted, however, that the payment was in settlement of certain lender-liability claims that he had considered bringing against MDFC on behalf of Harrod's estate.

The bankruptcy court ordered the avoidance of the transfer under 11 U.S.C. §§ 544(b) and 548(a) on the grounds that the transfer was made without valuable consideration and with the intent to defraud TSR's creditors. Pursuant to 11 U.S.C. § 550(a), which permits a trustee to recover the property or the value of the property whose transfer was avoided under § 544 or § 548, the bankruptcy court held that the payment from Jackson National to the Trust was recoverable by the Trustee for the benefit of TSR and its creditors. Heavrin and Bridges were therefore ordered to pay the TSR Trustee the money that they had received through the Harrod Trust, together with interest at 8% per annum.

The bankruptcy court also directed Heavrin to disgorge approximately $46,000 of the roughly $153,000 in attorney fees that he was paid by TSR during the year preceding TSR's bankruptcy because Heavrin had failed to report these payments to the bankruptcy court as required by the Federal Bankruptcy Rules. *See* 11 U.S.C. § 329; Fed. R. Bankr. P. 2016. Finally, the bankruptcy court denied Heavrin's petition requesting that Bankruptcy Judge David T. Stosberg recuse himself on the grounds of his alleged bias against Heavrin.

## C.        District court proceedings

Heavrin appealed the bankruptcy court's decision to the United States District Court for the Western District of Kentucky. The district court upheld the decision of the bankruptcy court with respect to the avoidance of the transfer, but did so under a different theory. It held that the transfer was avoidable under 11 U.S.C. § 548(a) on the basis of constructive fraud rather than actual fraud. The district court also upheld the denial by the bankruptcy court of Heavrin's recusal motion, but concluded that the bankruptcy court had erred in requiring Heavrin to disgorge approximately $46,000 of the attorney fees that he had received from TSR prior to the bankruptcy.

Heavrin timely appealed to this court, claiming that the district court had erred in affirming the avoidance of the transfer to the Trust and in upholding the bankruptcy court's denial of his recusal motion. He also argues, apparently for the first time, that the bankruptcy court erred in requiring him to pay prejudgment interest at a rate of 8% per annum on the attorney fees that he was ordered to disgorge.

## D.        Other appeals

Two previous appeals have been heard by this court in connection with the TSR bankruptcy. In *Schilling v. Heavrin (In re Triple S Restaurants)*, Nos. 04-5194/5402, 2005 WL 1140625 (6th Cir. May 10, 2005) (unpublished) (per curiam) [hereinafter *TSR I*], we affirmed the bankruptcy court's denials of motions submitted by Heavrin, Bridges, and the Trust to recuse Bankruptcy Judge Stosberg, to extend the time to appeal, and to permit amendment of the notice of appeal to include the Trust and Bridges as appellants. We also affirmed the district court's finding that the bankruptcy court's order was a final judgment. In *Schilling v. Heavrin (In re Triple S Restaurants)*, No. 04-5330, 2005 WL 1109615 (6th Cir. May 10, 2005) (unpublished) (per curiam) [hereinafter *TSR II*], we reinstated the bankruptcy court's judgment requiring Heavrin to disgorge a portion of the attorney fees that he received from TSR prior to the bankruptcy.

# II.  ANALYSIS

## A.        Standard of review

"When we review bankruptcy decisions, our standard of review is slightly different from our normal standard of review because district courts are not the triers of fact of bankruptcy cases." *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 88 (6th Cir. 1993). Because the bankruptcy court makes the initial findings of fact, the district court is bound by these findings unless they are clearly erroneous. *Id.* "If the district court's decision is appealed to this court, then we review the district court's conclusions of law de novo," and we accord no deference to the district court's findings of fact. *Id.* (stating that "we do not review the district court's assessment of the bankruptcy court's factual findings," but instead "follow the *bankruptcy* court's factual findings . . . [unless] we consider them to be clearly erroneous") (emphasis in original).

## B.        Avoidance of the transfer

The bankruptcy court determined that the transfer of the Harrod policy from TSR to the Trust could be avoided by the TSR Trustee in accordance with either 11 U.S.C. § 544(b) or 11 U.S.C. § 548(a). Pursuant to section § 544(b), a trustee may avoid a transfer if the transferor was insolvent at the time and if the transfer is voidable under applicable state law. There is no dispute in the present case that TSR was insolvent at the time of the transfer. Thus, the dispositive question under § 544(b) is whether the transfer is voidable under Kentucky law. The bankruptcy court held that the transfer of the Harrod policy is voidable under Kentucky Revised Statutes § 378.010, which provides that transfers shall be void as to creditors if "made with the intent to delay, hinder or defraud creditors, purchasers or other persons," and under Kentucky Revised Statutes § 378.020,

which provides that transfers of a debtor shall be void against existing creditors if made "without valuable consideration."

In an alternative holding, the bankruptcy court also determined that the transfer of the Harrod policy could be avoided by the TSR Trustee pursuant to 11 U.S.C. § 548(a). This section permits the avoidance of a transfer made within one year of the filing of the bankruptcy petition if the transfer was made with the intent to hinder, delay, or defraud the transferor's existing or future creditors, or if the transferor was insolvent at the time of the transfer and did not receive consideration that was reasonably equivalent in value to the transferred asset.

Heavrin argues that the bankruptcy court erred in concluding that the transfer was avoidable under either §§ 544(b) or 548(a) because, he asserts, the ownership of the Harrod policy had no value for TSR. As a result, transferring the policy to the Trust purportedly did not diminish the bankruptcy estate. He insists that (1) the Harrod policy proceeds were not the property of TSR because they were fully assigned to MDFC, and (2) the $250,000 payment directed by MDFC to the Trust was in settlement of certain lender-liability claims possessed by Harrod that were completely unrelated to the Trust's ownership of the Harrod policy.

### 1.    *Heavrin has not established that MDFC was unconditionally entitled to all of the policy proceeds*

If Heavrin is correct, and TSR did not lose anything of value when it transferred the Harrod policy to the Trust, then TSR's unsecured creditors were not defrauded and the transfer cannot be avoided. *See Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 55-56 (5th Cir. 1993) ("When a payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor decrease the bankruptcy estate."). The fact that the Trust was able to secure a payment from MDFC by virtue of its ownership of the Harrod policy, in other words, does not make the transfer avoidable if TSR would have been unable to extract a similar benefit had it retained ownership of the policy.

Heavrin's first contention—that no transfer of TSR's property occurred because the Harrod policy proceeds were fully assigned to MDFC—is not borne out by the evidence. Heavrin insists that, because TSR had assigned the proceeds of the Harrod policy to MDFC, the entire $2 million from Jackson National belonged to MDFC regardless of whether TSR retained ownership of the policy or transferred ownership to the Trust. *See Edgeworth*, 993 F.2d at 55 ("Acknowledging that the debtor owns the policy, however, does not end the inquiry. The question is not who owns the polic[y], but who owns the liability proceeds.") (citation and quotation marks omitted).

Whether MDFC was unconditionally entitled to the full proceeds of the Harrod policy, however, is far from clear. The TSR Trustee points to the fact that there are no documents demonstrating that the assignment of the Harrod policy was collateral for the loan from MDFC. In the absence of such proof, the Trustee asserts that the issue was ripe for negotiation and litigation— proceedings that could have resulted in TSR retaining at least a part of the Harrod policy proceeds. *See Demczyk v. Mut. Life Ins. Co. of N.Y. (In re Graham Square, Inc.)*, 126 F.3d 823, 831 (6th Cir. 1997) (stating that "property of the estate includes the debtor's interest in a cause of action").

Circumstantial evidence, admittedly, supports Heavrin's contention that all of the Harrod policy proceeds belonged to MDFC as collateral for the loan to TSR. For instance, three days after securing the loan from MDFC, TSR's predecessor in interest, S&B, purchased the original policy on Harrod's life from Transamerica. An internal MDFC memorandum also states that MDFC's loan to TSR was "secured by a lien on the equipment in the stores it financed, a letter of credit in the amount of $356K, and a key man insurance policy on the partners in the amount of $2,000K."

On the other hand, there is no direct evidence to establish that MDFC was entitled to *all* of the proceeds from the Harrod policy. The policy is not mentioned in any of the loan documents between MDFC and TSR. And, although the policy on Harrod's life was purchased three days after the loan was made, the assignment of the policy proceeds to MDFC did not take place until November of 1991, more than three years later.

There is also evidence that TSR had intended another use for at least some of the Harrod policy proceeds. A stock purchase agreement entered into by Harrod and TSR in 1988 states that, upon Harrod's death, the "proceeds of the life insurance policy(s) pertaining to this Agreement shall be used for the purpose of redemption." The insurance policy referenced in the agreement is the Jackson National policy on Harrod's life. This potential dual use of the proceeds—for both loan repayment and stock redemption—creates an obvious ambiguity.

Finally, the facts support another theory under which TSR would be entitled to some of the insurance proceeds without resorting to extortionate litigation tactics. TSR's $3.56 million loan was secured by $4 million worth of life insurance—$2 million on the life of Harrod and $2 million on the life of Macatee. Thus, although MDFC was theoretically entitled to collect up to $2 million upon the death of either man, a proportional division of liability would result in approximately $1.75 million being applied to MDFC's loan and leave roughly $250,000 to the owner of the policy. This is precisely the amount that Heavrin gained through the transfer of the policy from TSR to the Trust, an amount that presumably would have redounded to TSR in the absence of the transfer.

Although the record is ambiguous as to *why* MDFC ceded $250,000 to the Trust, there is no question that the settlement agreement between the Trust and MDFC acknowledges that "[s]ubsequent to the Trust becoming the beneficiary of the Policy, a dispute ha[d] arisen between the Trust and MDFC as to the amount of the Policy proceeds payable to MDFC." In order to "settle the dispute in a manner which [would] expedite payment of the Policy proceeds," MDFC agreed to pay the Trust $250,000 plus interest. This evidence severely weakens Heavrin's assertion that the entire proceeds of the Harrod policy undisputably belonged to MDFC and consequently were of no value to TSR. We therefore cannot say that the bankruptcy court erred when it rejected Heavrin's claim on this basis.

Heavrin's contention that all of the Harrod policy proceeds belonged to MDFC is further undercut by an argument in Heavrin's appellate brief. He contends that, regardless of whether TSR retained ownership of the Harrod policy or transferred it to the Trust, TSR was entitled to "$2,000,000 in debt reduction upon payment of all the Policy proceeds to MDFC." But Heavrin's counsel acknowledged at oral argument that, in the proof-of-claim documents that MDFC filed in the TSR bankruptcy proceedings, MDFC credited TSR with only $1.75 million in debt reduction after receiving that amount from the proceeds from the Harrod policy. This amount is $250,000 shy of the full $2 million in policy proceeds payable on Harrod's death, and corresponds to the allocation of the proceeds that Heavrin negotiated on behalf of the Trust. The fact that MDFC credited TSR for only a portion of the proceeds of the Harrod policy is an indication that MDFC did not consider all of the proceeds to be its property.

Furthermore, even if the primary effect of avoidance would be to send the $250,000 back to MDFC, that money would offset TSR's outstanding debt to MDFC, thereby freeing up funds in that amount to pay the unsecured creditors. Avoiding the $250,000 transfer, in other words, decreases the amount of secured debt and increases the Trustee's ability to pay the remaining creditors. Because such avoidance establishes a benefit to TSR's unsecured creditors, we can—and do—reject Heavrin's argument that avoiding the transfer would benefit only MDFC.

**2.      *Heavrin has not established that the payment from MDFC was in settlement of lender-liability claims***

Heavrin also advances the argument that the transfer of the Harrod policy to the Trust did not harm TSR's unsecured creditors because the payment that the Trust received from MDFC was in settlement of certain lender-liability claims possessed by Harrod that were completely unrelated to the Trust's ownership of the Harrod policy. He contends that MDFC had the settlement to the Trust paid from the proceeds of the Harrod policy merely as a matter of convenience, not because the policy proceeds were in any way related to the payment.

The circumstances surrounding the payment from MDFC, however, do not support Heavrin's contention on this ground either. As the bankruptcy court noted, a letter written to Heavrin by MDFC states that "[t]he disbursement of the $250,000 would represent the full settlement of all matters relating to this insurance policy." This letter alone constitutes persuasive evidence that the payment authorized by MDFC was related to the Trust's ownership of the Harrod policy. Moreover, the settlement was paid to the Trust, not to Harrod's estate. If the $250,000 payment authorized by MDFC was in settlement of lender-liability claims that Harrod possessed personally, as Heavrin argues, then MDFC would presumably have directed the payment to Harrod's estate. The fact that this was not done suggests that ownership of the Harrod policy, which the Trust possessed but Harrod's estate did not, was an important consideration for MDFC in authorizing the payment to the Trust.

Also problematic for Heavrin is the fact that the payment by MDFC came directly out of the Harrod policy proceeds as a transfer of funds from Jackson National to the Trust. Heavrin explains that he arranged for this payment to be made in this manner in response to his "fear[] that MDFC would renege on the settlement after it received the Policy proceeds." But this admission suggests that the owner of the Harrod policy had at least some additional leverage when negotiating with MDFC, which is contrary to Heavrin's argument that ownership of the policy was "essentially meaningless and absolutely worthless."

The core of Heavrin's argument is that he asserted lender-liability claims on behalf of Harrod's estate and that he collected the $250,000 as a result of those claims. The bankruptcy court rejected this argument, observing that the Trust did not stand in a borrower–lender relationship with MDFC and finding that Heavrin had not pointed to any egregious conduct by MDFC that could have formed the basis for such claims. Although we agree with the bankruptcy court's observation that the Trust did not stand in a borrower-lender relationship with MDFC, Heavrin has a legitimate argument to the extent that he was negotiating on behalf of Harrod's estate rather than the Trust. Nevertheless, Heavrin's consistent failure to explain the legal basis for the alleged lender-liability claims is fatal to his defense.

Heavrin does not insist that he is prevented from making such a disclosure by any confidentiality agreement with MDFC. And the disclosure of any grounds possessed by Harrod for such a suit could not possibly harm MDFC because the litigation between the Trustee and MDFC has already been settled. *See Schilling v. MDFC Equip. Leasing Corp.*, AP No. 95-3096 (Bankr. W.D. Ky. Dec. 11, 1995) (unpublished) (stating that the agreed-upon order was entered in "settlement and compromise of any and all causes of action of plaintiff and/or this bankruptcy estate against defendant"). Heavrin's inability to provide a description of the alleged lender-liability claims suggests that there were no such claims. Instead, the Trust's ownership of the Harrod policy appears to have been the key factor that caused MFDC to have the $250,000 paid to the Trust. We therefore agree with the bankruptcy court that Heavrin has failed to establish that the policy proceeds paid to the Trust were in settlement of any lender-liability claims.

In agreeing with the courts below regarding Heavrin's inability to explain the nature of the alleged claims, we also affirm those courts' decision to shift the burden of proof to Heavrin on this point. Indeed, Heavrin does not argue that he presented evidence that justified a contrary finding as to the lender-liability claims, but instead maintains that the bankruptcy court erred in shifting the burden of proof to him to do so. He contends that the TSR Trustee had the burden to demonstrate that the policy proceeds paid to the Trust were made to settle claims that would have rightfully belonged to TSR had it retained ownership of the Harrod policy. This is the contention to which we now turn.

### 3. Heavrin's position as an insider and his status as a close relative constitute "badges of fraud" that justify shifting the burden of proof

Heavrin is correct in pointing out that a trustee attempting to avoid an allegedly fraudulent transfer normally bears the burden of proof on that issue, but the bankruptcy court in the present case found that the transfer of the Harrod policy from TSR to the Trust displayed several "badges of fraud" that justified shifting the burden of proof to Heavrin to demonstrate that the transfer did not harm TSR's unsecured creditors. *See United States v. Westley*, No. 98-6054, 2001 WL 302068, at *6 (6th Cir. Mar. 21, 2001) (unpublished) ("[I]f there are 'badges of fraud' which cast suspicion on the transaction, the burden of proof shifts to the defendant to explain the transaction and show that it was not fraudulent."). "Badges of fraud are circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them." *United States v. Isaac*, No. 91-5830, 1992 WL 159795, at *4 (6th Cir. July 10, 1992) (unpublished) (citation and quotation marks omitted).

One badge of fraud identified by the bankruptcy court with respect to the transfer of the Harrod policy was that the beneficiaries of the Trust—Heavrin and Bridges—were the children of one the co-owners of TSR. *See Isaac*, 1992 WL 159795, at *4 (stating that "Kentucky courts treat transfers between close family members or people in confidential relationships, in the context of impending financial difficulties, as a badge of fraud"); *Cooper v. Osbourne (In re Osbourne)*, 124 B.R. 726, 728 (Bankr. W.D. Ky. 1989) (listing "transfers made to a family member or close relation" as a badge of fraud).

Another badge of fraud identified by the bankruptcy court was Heavrin's position as corporate counsel for TSR, which made him an insider with respect to TSR's transfer of the Harrod policy to the Trust. Because he benefitted from the transfer, the court found that Heavrin's insider status was a badge of fraud that justified shifting the burden of proof. *See Isaac*, 1992 WL 159795, at *4 ("We have often written that courts look with suspicion upon transactions between persons occupying confidential relations. When such a transaction is exposed to scrutiny, the burden is always upon the recipient of the property acquired to show that the conveyance was fairly made and not tainted with an intent to accomplish a fraudulent purpose.") (citation and quotation marks omitted).

In shifting the burden of proof to Heavrin after finding that the transfer of the Harrod policy was attended by badges of fraud, the bankruptcy court cited to *Green v. Stevenson (In re Stevenson)*, 69 B.R. 49 (Bankr. E.D. Mo. 1986), for support. The court in *Stevenson*, however, decided to shift the burden of proof to the defendant only after concluding that the transfer at issue was made without adequate consideration. *Id.* at 50 ("Where a transfer is between related parties, the transfer is subject to close scrutiny and gives rise to a presumption of actual fraudulent intent where the transfer is without adequate consideration.") (citation and quotation marks omitted); *see also* Peter Spero, *Fraudulent Transfers: Applications and Implications* § 15:3 (2005) ("Where the transaction involves family members . . . *and the transaction was made without any tangible consideration*, a heavier burden is placed upon the grantee to demonstrate fair consideration for the transfer.") (citation and quotation marks omitted) (emphasis added).

In the present case, the parties dispute whether the Trust provided adequate consideration for the transfer of the Harrod policy. The TSR Trustee argues that the Trust provided no consideration. Heavrin, on the other hand, contends that the Trust's diligence in having MDFC keep up the premium payments was adequate consideration. The bankruptcy court resolved this dispute by concluding that the consideration received by TSR for the transfer was inadequate, but we need not reach this issue in order to affirm the district court's finding that the transfer may be avoided pursuant to 11 U.S.C. § 548(a). We also do not have to reach the issue in order to decide whether the bankruptcy court erred in shifting the burden of proof on this issue to Heavrin, because we hold that the burden of proof may shift even where consideration has not been shown to be inadequate. Our holding is based on a survey of the limited caselaw on this issue and a consideration of the purposes served by shifting the burden of proof when badges of fraud are shown.

In *Westley*, 2001 WL 302068, at *6, this court concluded that the fact that insiders were the beneficiaries of the transfer was a "badge of fraud" that, in and of itself, "cast suspicion on the transaction" and shifted the burden of proof to the defendants. *See also Anderson & Assocs. v. S. Textile Knitters de Honduras Sewing Inc. (In re S. Textile Knitters)*, Nos. 01-2369, 02-1365, 2003 WL 124771, at *6 (4th Cir. Jan. 16, 2003) (unpublished) ("Since the transfers at issue here were made to members of the family, Defendants have the burden to establish both a valuable consideration and the bona fides of the transaction by clear and convincing testimony."). The above-referenced treatise, *Fraudulent Transfers: Applications and Implications*, also acknowledges that, where a transfer is made to an insider, "[t]he burden may change . . . [if] the evidentiary facts as to the nature and value of the consideration are within the transferee's control, in which case the burden of coming forward with evidence on the fairness of the consideration shifts to the transferee." § 15:3 (citation and quotation marks omitted).

MDFC's true reason for directing the $250,000 payment to the Trust is unclear. This enigma is due in part to the fact that Heavrin, as the chief negotiator of the deal with MDFC, offered very little evidence with respect to why the Trust received the money. The assignment of the burden of proof thus becomes the key to determining whether the transfer of the Harrod policy may be avoided. Given the badges of fraud attending to the transaction—revolving around the fact that the lawyer for the failing business was the stepson of one of its founders and the primary beneficiary of the transfer—we find no good reason to require the Trustee to produce evidence that could much more readily be supplied by Heavrin. Under such circumstances, equitable principles call upon Heavrin to demonstrate that the transfer of the insurance policy did not harm TSR's unsecured creditors. *See Doss v. Green (In re Green)*, 986 F.2d 145, 150 (6th Cir. 1993) ("This court marvels at the debtor's attempt to circumvent the fraudulent conveyance laws. However, bankruptcy courts are courts of equity. A court of equity will not relieve a party with 'unclean hands.' This doctrine closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief.") (citations and quotation marks omitted).

Heavrin has failed to demonstrate that the transfer of the Harrod policy to the Trust did not harm TSR's unsecured creditors. We therefore conclude that the bankruptcy court did not err in determining that the transfer of the policy could be avoided pursuant to 11 U.S.C. § 548(a), which permits the avoidance of a transfer if it was made with the intent to hinder, delay, or defraud a transferor's existing and future creditors. *See Zenter GBV Fund IV, LLC v. Vesper*, Nos. 00-5385/5386, 2001 WL 1042217, at *5 (6th Cir. Aug 29, 2001) (unpublished) ("'Because proof of actual intent to hinder, delay or defraud creditors may rarely be established by direct evidence, courts infer fraudulent intent from the circumstances surrounding the transfer.'") (quoting *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1353 (8th Cir. 1995)).

## C.	Assessment of prejudgment interest

Heavrin raises, for the first time on appeal, the contention that the bankruptcy court erred in imposing prejudgment interest on the roughly $46,000 in attorney fees that he was required to disgorge. He did not list this as one of the issues to be appealed from the bankruptcy court and did not raise the issue before the district court. The issue is therefore waived. *See United States v. Ninety-Three (93) Firearms*, 330 F.3d 414, 424 (6th Cir. 2003) ("This court has repeatedly held that it will not consider arguments raised for the first time on appeal unless our failure to consider the issue will result in a plain miscarriage of justice.") (citation and quotation marks omitted).

Even if this claim had not been waived, however, it would have no merit. As Heavrin concedes, the assessment of prejudgment interest is left to the sound discretion of the bankruptcy court. Heavrin was paid over $153,000 in attorney fees by TSR in the year preceding TSR's filing for bankruptcy, and the bankruptcy court required Heavrin to disgorge less than a third of this amount. This court reviewed the bankruptcy court's partial disgorgement order in *TSR II*, No. 04-5330, 2005 WL 1109615, at *6 (6th Cir. May 10, 2005) (unpublished) (per curiam), and concluded that the bankruptcy court's "final order was, if anything, unduly generous to Heavrin." Thus we cannot say that the bankruptcy court abused its discretion in imposing prejudgment interest at a rate of 8% per annum on the approximately $46,000 in attorney fees that Heavrin was required to disgorge. *See Henderson v. Kisseberth (In re Kisseberth)*, 273 F.3d 714, 720 (6th Cir. 2001) (stating that the court "will find an abuse of discretion only upon a definite and firm conviction that the trial court committed a clear error of judgment") (citation and quotation marks omitted).

## D.	Recusal of the bankruptcy judge

The final issue raised on appeal is whether Bankruptcy Judge Stosberg erred in not recusing himself. This court partially addressed the issue in *TSR I*, Nos. 04-5194/5402, 2005 WL 1140625 (6th Cir. May 10, 2005) (unpublished) (per curiam), when we reviewed the bankruptcy court's denial of a motion for recusal originally filed by Heavrin in 1995. We affirmed the bankruptcy court's order denying Heavrin's motion because it was not timely. *Id.* at *1 ("As the bankruptcy court found, the defendants' motion to recuse was untimely and was therefore properly denied."). But Heavrin filed a second recusal motion in 2001 that was based on events occurring after his 1995 motion was filed. This second motion was denied by the bankruptcy court on the merits, with no mention made of untimeliness. In the present appeal, we are therefore bound by the decision of this court in *TSR I* with respect to all arguments raised in Heavrin's 1995 recusal motion, but we reach the merits of the arguments that Heavrin raises in his 2001 motion.

We will uphold a lower court's denial of a recusal motion so long as the court's decision does not constitute an abuse of discretion. *Youn v. Track, Inc.*, 324 F.3d 409, 422 (6th Cir. 2003). The relevant federal recusal statute, 28 U.S.C. § 455, provides in pertinent part as follows:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

> (b) He shall also disqualify himself in the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . .

A judge's unfavorable disposition toward an individual or his case, however, does not typically constitute judicial "bias or prejudice." *See Liteky v. United States*, 510 U.S. 540, 550 (1994). Rather, "[t]he words [bias and prejudice] connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess . . . or because it is excessive in degree." *Id.* (emphasis in original). Bias on the part of a judge commonly stems from an "extrajudicial"

source, meaning knowledge that the judge has acquired that is not based on either the proceedings before him or on other legal proceedings involving the same parties. *Id.* at 551.

In rare cases, a "favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." *Id.* These rare cases aside, however, opinions held by judges as a result of what they learn in the proceedings at issue or in earlier proceedings are "not subject to deprecatory characterization as 'bias' or 'prejudice.'" *Id.* ("It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant.").

Heavrin alleges that Bankruptcy Judge Stosberg was biased against him because of dealings that the two of them had prior to Stosberg's appointment to the bench, during which Heavrin opposed the payment of $1,400 in fees to then-examiner Stosberg on the basis that Stosberg's examination was "incompetent, incomplete, and worthless." This dispute was resolved by the federal district court when the debtor was ordered to pay Stosberg's fee over the objection of Heavrin. Although the characterization by Heavrin of Stosberg's work as "incompetent, incomplete, and worthless" might have offended or angered Stosberg at the time, Heavrin's opposition to the payment of the fees was ultimately unsuccessful, and Bankruptcy Judge Stosberg suffered no pecuniary loss as a result. We thus have no reason to believe that Bankruptcy Judge Stosberg remained so upset by Heavrin's past opposition to his fee request that he was unable to decide this case on the merits.

Heavrin further contends that Bankruptcy Judge Stosberg became biased against him as a result of events that occurred during the TSR bankruptcy proceedings. The bankruptcy court imposed sanctions against David Chinn, a bankruptcy attorney hired by TSR and a tenant in Heavrin's offices, for paying Heavrin a portion of Chinn's retainer from TSR as a rent payment. Heavrin was criticized by the court for accepting the payment in light of his status as a TSR insider and because he had referred the case to Chinn. In its opinion, the bankruptcy court described Heavrin's conduct and characterized his behavior as "deplorable," but then struck these comments from its modified opinion after Heavrin objected. This characterization of Heavrin's behavior, however, was an opinion formed by the bankruptcy court during the proceedings involving Heavrin, and can therefore be deemed an indicium of bias only if it is "so extreme as to display clear inability to render fair judgment." *Liteky*, 510 U.S. at 551. The bankruptcy court removed the offending language from its opinion at Heavrin's request, which leads us to conclude that the court's conduct was not so extreme as to require recusal.

Finally, Heavrin contends that Bankruptcy Judge Stosberg exhibited bias by deciding to place the burden on Heavrin to prove that he was entitled to retain the money paid to him by the Trust, rather than on the TSR Trustee to prove that the transfer should be avoided. According to Heavrin, the "trial was little more than a means to an inevitable end, during the course of which the court was openly hostile to counsel and his client." This argument is without merit not only because we find that the bankruptcy court properly placed the burden of proof on Heavrin, but because Heavrin has failed to produce any concrete examples that demonstrate Bankruptcy Judge Stosberg's alleged hostility. *See Gen. Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1043 (6th Cir. 1990) (requiring the moving party to allege "facts which a reasonable person would believe would indicate a judge has a personal bias against the moving party. Conclusions, rumors, beliefs, and opinions are not sufficient to form a basis for disqualification.") (citations and quotation marks omitted).

None of Heavrin's three complaints regarding Bankruptcy Judge Stosberg give rise to the necessary "definite and firm conviction that the trial court committed a clear error of judgment."

*Youn*, 324 F.3d at 422 (citation and quotation marks omitted). We therefore conclude that the bankruptcy court did not abuse its discretion by denying Heavrin's motion to recuse.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.