NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0879n.06
Filed: December 27, 2007

No. 05-5294

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| JAMES FRANCIS ANGELUS, | ) | MIDDLE DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

**Before: ROGERS and SUTTON, Circuit Judges; and BERTELSMAN, District Judge.**[*]

**ROGERS, Circuit Judge.** In the course of resisting arrest, defendant James F. Angelus seriously injured a United States Deputy Marshal for the Middle District of Tennessee. Prior to his federal criminal trial for that assault, which was held in Nashville, Tennessee, Angelus filed a motion requesting a change of venue and a motion seeking the recusal of all judges of the Middle District of Tennessee. Because Angelus failed to demonstrate sufficiently that his trial would be prejudiced by either judicial bias or pretrial publicity, the district court's denial of these motions did not constitute an abuse of discretion. Accordingly, we affirm the judgment of conviction.

---

[*]The Honorable William O. Bertelsman, Senior District Judge for the Eastern District of Kentucky, sitting by designation.

I.

The Middle Tennessee Joint Fugitive Task Force ("Task Force") received information on April 20, 2004 that Angelus, who was wanted in Florida on outstanding felony warrants, was residing in the Nashville area. The Task Force was supervised at that time by Deputy U.S. Marshal Kevin Koback, who has worked in the Nashville U.S. Marshals Office since 1992. In addition to serving on the Task Force, Koback's duties include working in court with prisoners, transporting prisoners, serving civil process, and executing arrest warrants.

On April 22, 2004, the Task Force set up surveillance in the vicinity of the apartment where Angelus was believed to have been staying. After an unsuccessful search for Angelus in that area, Koback and fellow Task Force member Doug Anderson eventually located Angelus sitting in a vehicle parked at a nearby gas station. To prevent Angelus from leaving the gas station parking lot, Koback parked his van immediately behind Angelus's truck. As Koback and Anderson approached the truck, they called out to Angelus and his passenger, instructing them to put their hands in the air and exit the vehicle. Angelus raised his hands, as requested, but instead of exiting the vehicle, he put the truck in reverse and drove into Koback's van in an effort to flee. To thwart Angelus's escape, Koback ran to the truck, opened the driver's side door, and attempted to pull Angelus from the vehicle. With Koback hanging onto the truck by the driver's side door, Angelus, who had then managed to reorient the truck, began to drive forward. At that point, Koback's arm became caught in the truck's door. Ignoring Koback's continued orders for him to turn off the vehicle, Angelus drove over a curb, dragging Koback alongside the vehicle. Angelus then steered the vehicle straight

- 2 -

toward a tree, causing the driver's side of the truck, from which Koback was hanging, to sideswipe the tree. The impact of the collision caused Koback to break free from the truck. Angelus fled the scene but was apprehended a few hours later. These events left Koback seriously injured and led to "quite of bit of [media] coverage" on that date.

On April 29, 2004, Angelus was indicted by a federal grand jury in the Middle District of Tennessee for assaulting an employee of the United States with a deadly weapon while the employee was engaged in the performance of his official duties, in violation of 18 U.S.C. § 111(a)(1) and (b). Prior to the start of his trial, which was to be presided over by the Honorable Robert L. Echols of the Middle District of Tennessee, Angelus filed motions for a change of venue and for the recusal of all judges sitting in the Middle District of Tennessee, which includes Nashville. In support of his motions, Angelus argued that these judges would be biased, or would at least appear biased, by their interactions with Koback and by their relationship with the U.S. Marshals Service, whose office is located in the same building as the federal courthouse. Angelus also asserted that the coverage of his case by the Nashville media would prevent his receiving a fair trial.

The district judge denied both of Angelus's motions. The district judge determined that recusal was unnecessary because the judge had no special relationship with Koback and held no bias toward Angelus. Further, the district judge concluded that although Angelus's case had received some media attention, it would not stand out in the minds of jurors, who were faced daily with "salacious occurrences." Although he denied Angelus's motions, the district judge advised the parties that he would question potential jurors about their familiarity with the case and would give

both sides the opportunity to do the same. The case proceeded to trial and on September 9, 2004, a jury found Angelus guilty. Angelus appeals his conviction, challenging the denial of his pre-trial motions.

II.

The district court did not abuse its discretion by denying Angelus's motions for a change in venue and for recusal. This court will reverse a district judge's denial of either of these motions only where it is left with a "definite and firm conviction that the trial court committed a clear error of judgment." *See In re Triple S Restaurants, Inc.*, 422 F.3d 405, 418 (6th Cir. 2005); *see also United States v. Jamieson*, 427 F.3d 394, 412 (6th Cir. 2005). Because there was not a sufficient basis upon which to conclude that Angelus's trial would be prejudiced by either judicial bias or pretrial publicity, we affirm.

First, the district court did not abuse its discretion in denying Angelus's motion for recusal because neither the judge's personal nor professional relationship with Koback and the U.S. Marshals Office was substantial enough for a reasonable person to doubt the court's impartiality. Pursuant to 28 U.S.C. § 455(a) and (b)(1), a judge must recuse himself "in any proceeding in which his impartiality might reasonably be questioned" or "[w]here he has a personal bias or prejudice concerning a party." The proper inquiry with respect to recusal is an objective one, and asks whether "'a reasonable, objective person, knowing all of the circumstances, would have questioned the judge's impartiality.'" *United States v. Hartsel*, 199 F.3d 812, 820 (6th Cir. 1999) (quoting *Hughes*

*v. United States*, 899 F.2d 1495, 1501 (6th Cir. 1990)). Although a judge is obliged to disqualify himself when there is a close question concerning his impartiality, *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993), he has an equally strong duty to sit where disqualification is not required, *Laird v. Tatum*, 409 U.S. 824, 837 (1972) (separate memorandum of Rehnquist, J.) (collecting cases).

The district judge here concluded that he had no special relationship with Koback or any other U.S. Marshal that would cause him to be prejudiced toward Angelus and that the mere fact that the U.S. Marshals Office is located in the same building as the federal courthouse was not a sufficient reason for recusal. Angelus maintains on appeal that there is a close working relationship between the judges of the United States District Court for the Middle District of Tennessee and the U.S. Marshals Office, and that a reasonable person would question whether this relationship would bias the district judge.

The district judge's refusal to recuse himself did not constitute an abuse of discretion because, according to the record, his relationship with Koback and other parties in the U.S. Marshals Office was at most that of professional acquaintance and was thus inadequate to bias the judge. Notably, Angelus does not allege, much less offer evidence to suggest, that there was a close, personal relationship between the district judge and Koback or any other party in the Marshals Office. There is no evidence that the district judge even knew who Koback was prior to when the judge was assigned to preside over Angelus's trial. Similarly, Angelus has proffered no evidence of significant interaction between the district judge and any other parties in the U.S. Marshals Office,

either inside or outside of the courtroom, from which one could infer the type of close relationship that might threaten his impartiality. Where, as here, a judge's relationship with a party is "merely that of an acquaintance, not an intimate, personal relationship or a relationship in which [the judge] would be obligated [to a party]," recusal is not necessary. *Dandy*, 998 F.2d at 1349.

Angelus's only ground for alleging bias, or the appearance of bias, then, is the professional relationship between the United States District Court for the Middle District of Tennessee and the U.S. Marshals Office. It is true that the U.S. Marshals Office is located in the same building as the federal courthouse and that, among the many services that they provide, the U.S. Marshals act as bailiffs for, and protectors of, the federal courts. Without more, however, these facts establish only that the district judge had a professional relationship with certain members of the U.S. Marshals Office. But, "mandatory disqualification . . . is not warranted simply because of a professional relationship with a victim." *Clemens v. U.S. District Court for the Cent. District of Cal.*, 428 F.3d 1175, 1180 (9th Cir. 2005); *see also United States v. Faul*, 748 F.2d 1204, 1211 (8th Cir. 1984) (stating that it did not follow from a Marshal's provision of security to a court "that the judge had a 'professional or personal relationship'. . . sufficient to demonstrate personal prejudice"); *United States v. Sundrud*, 397 F. Supp. 2d 1230, 1236 (C.D. Cal. 2005) ("But the existence of a working relationship in of itself does not demonstrate or presume personal bias or prejudice . . . .") (quotation omitted). Judges interact with many different parties in a professional capacity, such as the United States Attorney's Office, the Federal Public Defender's Office, local sheriff offices, and various court personnel. A judge is not expected to recuse himself whenever a party from one of these

organizations appears before him.  *See Eubanks v. Walton*, No. 96-3983, 1997 WL 778118, at *1 (6th Cir. Dec. 11, 1997).

The fact that the professional relationship between the U.S. Marshals and the federal courts involves the provision of security to the courts does not compel a different result.  While the protection that the U.S. Marshals provide is no doubt an invaluable service, this by itself is not sufficient to threaten a judge's impartiality.  Our conclusion here finds considerable support in case law, as multiple courts have held that a professional relationship with a victim who provides court security does not necessitate recusal.  For instance, in *United States v. Faul*, 748 F.2d at 1210-11, the Eighth Circuit concluded that a district judge did not abuse his discretion by declining to recuse himself from a case in which the defendants were charged with the second-degree murder and assault of two U.S. Marshals who may have provided the judge with security on prior occasions.  Likewise, in *United States v. Sundrud*, 397 F. Supp. 2d at 1233-37, a district judge for the Central District of California declined to disqualify all district judges of the Central District from a case in which the defendant was accused of assaulting a court security officer, observing that "judges who sit in courthouses under the aegis of protection provided by the victims of such attacks regularly try the accused."  *Id.* at 1236; *see also United States v. Ramsey*, 871 F.2d 1365, 1367 (8th Cir. 1989); *United States v. Jacobs*, No. CRIM 05-64, 2006 WL 456178, at *1-2 (W.D. Pa. Feb. 22, 2006).

Second, the district court similarly did not abuse its discretion by denying Angelus's motion to change venue, as local media coverage of the case was limited and Angelus has made no showing that his jury was actually prejudiced by such coverage.  A criminal defendant has a constitutional

right to a fair trial by a panel of impartial jurors. *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961). Thus, when a defendant requests a change in venue, Federal Rule of Criminal Procedure 21(a) requires that the district court transfer the case to another district if "the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

Angelus contends that it was impossible for him to receive a fair trial in Nashville because of pretrial coverage of his case in the local media, and that a change in venue was thus required. The district court rejected this argument in denying Angelus's motion, finding that Angelus's crime was not likely to stand out in the minds of jurors, who hear about equally serious crimes on a daily basis.

The district court properly denied Angelus's motion for a change in venue. A claim of prejudice due to pretrial publicity must "be sustained not as a matter of speculation but as a demonstrable reality." *United States ex rel. Darcy v. Handy*, 351 U.S. 454, 462 (1956). Here, the record is devoid of evidence to support a finding of either actual or presumptive prejudice. *See Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007).

Prejudice cannot be presumed in this case because the limited media coverage of Angelus's crime did not create an "inflammatory, circus-like atmosphere" which "pervade[d] both the courthouse and surrounding community." *Id.* Angelus provides no factual support for his contention that the media coverage of his crime was "extensive." Angelus claims only that his crime was reported on television and in print media, and provides no further information, such as the number

of media stories about his crime, the content and tone of any stories, the duration of the initial coverage, and whether coverage of his case resumed when the jury was impaneled and the trial began over four months later. The only evidence in the record concerning media coverage suggests that local television stations covered the story the day of Angelus's assault of Koback. At trial, one witness testified that there was "quite a bit of coverage" on the evening news that night and suggested that the story may have also been covered during the lunch newscast that same day. Such coverage is no greater than what would normally occur for similar crimes and can hardly be characterized as extensive.

But even assuming that the coverage had been extensive, it would still be inadequate to create a presumption of prejudice here. As the Supreme Court explained in *Dobbert v. Florida*, 432 U.S. 282, 303 (1977), "extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." Rather, a defendant must show a "trial atmosphere . . . utterly corrupted by press coverage." *Murphy v. Florida*, 421 U.S. 794, 798 (1975). Given that this is a demanding standard, prejudice should be presumed in only the rare case. *See DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) ("Indeed, the few cases in which the Court has presumed prejudice can only be termed extraordinary . . . ."). Angelus has not, and cannot based on the evidence in the record, allege that media coverage of his crime led to a sufficiently inflammatory or circus-like atmosphere in the community or courtroom so as to justify a presumption of prejudice.

Angelus has also failed to establish that he suffered actual prejudice as a result of any pretrial publicity. To demonstrate actual prejudice, Angelus must "show through a review of voir dire testimony and the extent and nature of the publicity that a fair trial was impossible." *White v. Mitchell*, 431 F.3d 517, 532 (6th Cir. 2005) (internal quotation marks omitted).

Neither the nature of the media coverage nor evidence concerning the voir dire process used here support a finding of actual prejudice. As discussed, the record suggests that media coverage of Angelus's crime was rather modest and short-lived. Likewise, what little evidence that is present in the record regarding the voir dire procedure used here does not indicate that Angelus's jury was biased. There is no evidence showing that any of the potential jurors were even familiar with Angelus or the circumstances of his crime prior to the trial. Moreover, even assuming that some of the potential jurors had gained knowledge of the case from media coverage, the evidence suggests that the district judge took steps to ensure that the jury that was selected would not be tainted. In denying Angelus's motion to change venue, the district judge assured Angelus that the judge would question potential jurors about their knowledge of the case and would allow both parties to do the same. Angelus does not assert that the district judge neglected to do this, and, of perhaps more notable absence, Angelus does not claim that in questioning potential jurors his counsel found the jurors to be biased or objected to any of the potential jurors because of their prior exposure to the case. As the Supreme Court has observed, "[t]he fact that [a defendant] did not challenge for cause any of the jurors so selected is strong evidence that he was convinced the jurors were not biased and

had not formed any opinions as to his guilt." *Beck v. Washington*, 369 U.S. 541, 557-58 (1962); *see also DeLisle*, 161 F.3d at 382.

Angelus also argues that a change of venue was necessary because of the relationship between the district court and the U.S. Marshals Office. As previously discussed, this argument is without merit.

III.

For the foregoing reasons, we affirm the judgment of the district court.